[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15081

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 26, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-01671-CV-ORL-31DAB

AMY SHIRLEY OLIVER, as Personal Representative
of the Estate of Anthony Carl Oliver, Sr.,
Deceased, for and on behalf of the survivors
of the Estate of Anthony Carl Oliver, Sr.,

Plaintiff-Appellee,

versus

LORI FIORINO, in the official capacity
as Orlando Police Department officer,
DAVID BURK, in the official capacity
as Orlando Police Department officer,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(October 26, 2009)

Before MARCUS and HILL, Circuit Judges, and VOORHEES,[*] District Judge.

---

[*] Honorable Richard L. Voorhees, United States District Judge for the Western District of North Carolina, sitting by designation.

MARCUS, Circuit Judge:

In this civil rights case, Orlando police officers Lori Fiorino and David Burk appeal from the district court's denial of their motion for summary judgment on the basis of qualified immunity. Appellee Amy Shirley Oliver, as personal representative of the estate of Anthony Carl Oliver, Sr., alleges that the officers used excessive and unreasonable force in violation of Anthony Oliver's Fourth Amendment rights when they shocked him with a Taser gun at least eight times over a two minute span. The facts, when viewed in a light most favorable to Oliver, show that Oliver was neither accused nor suspected of a crime at the time of the incident, that Officer Fiorino tasered Oliver at least eight and as many as eleven or twelve times with each shock lasting at least five seconds, that the officers made no attempt to handcuff or arrest Oliver at any time during or after any Taser shock cycle, that the officer continued to administer Taser shocks to Oliver while he was lying on the hot pavement, immobilized and clenched up, and, finally, that these Taser shocks resulted in extreme pain and ultimately caused Oliver's death.

After thorough review, we conclude that the officers are not entitled to qualified immunity on the claim of excessive force, and, accordingly, we affirm.

I.

We review de novo the district court's resolution of a summary judgment motion on the basis of qualified immunity, and in so doing, we resolve all issues of material fact in favor of the plaintiff. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). We recognize that "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case," id. (internal quotation marks omitted); nonetheless we view them in a light most favorable to the plaintiff because "the issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain facts showed a violation of clearly established law." Id. (internal quotation marks and alterations omitted).

Taking the facts in a light most favorable to the plaintiff, this tragic story began on May 13, 2004, at approximately 3:17 p.m. Officer Fiorino was driving her police cruiser; she said she noticed a man, who later turned out to be Anthony Carl Oliver, Sr. ("Oliver"), standing in an eight to ten-foot-wide grassy median on West Colonial Drive near Tampa Avenue in Orlando, waving his arms and attempting to flag her down. Officer Fiorino turned her police cruiser around and parked in the Eastbound turning lane, blocking the turning lane and stopping any traffic in that lane. According to one bystander, Carl Hughley, the officer pulled up and asked Oliver to approach her vehicle. He complied. Oliver then knocked on the rear driver-side window and unsuccessfully attempted to open the locked

3

rear door of the police cruiser. Fiorino used her loud speaker to instruct Oliver to move to the front of her vehicle; again, he complied. Fiorino then directed Oliver to move further away from the vehicle, which he did. Fiorino then exited her vehicle. At this point, Oliver was standing some twenty-three feet away from Fiorino, who was near her vehicle.

Oliver did not speak before Officer Fiorino pulled out her Taser gun and asked Oliver what the problem was. Oliver responded to Fiorino's questions, saying "they're shooting at me" several times, and pointing across the street. Fiorino told Oliver to calm down and tell her what was going on. Oliver attempted to walk away; Fiorino asked him to stay and talk. According to Fiorino, Oliver then began to walk quickly toward her. In response, Fiorino raised her Taser gun and told Oliver to step away from her. Oliver complied. Fiorino observed that throughout this encounter, Oliver was "very fidgety." According to Hughley, however, Oliver never acted in a threatening or belligerent manner toward the officers, nor did he even curse at them.

Officer Fiorino asked Oliver for details about who was shooting at him and under what circumstances. She also called her dispatch to inquire whether there had been any reported shootings in the area. Dispatch told her there had been a shooting reported eight or nine miles away, but none in her area. When Fiorino was

4

advised there had been no shooting in the area, she requested back-up.

Shortly thereafter, Officer David Burk arrived on the scene. Burk parked his car so that it, along with Fiorino's car, boxed in the left turning lane where the incident was unfolding. When Burk arrived, Oliver was standing several feet from Fiorino in the median, speaking loudly and "moving his hands around." Fiorino and Burk testified that they considered taking Oliver into custody under Florida's Mental Health Act, Fla. Stat. § 394-463(1) ("the Baker Act"), because he appeared to them to be mentally unstable. Nonetheless, Fiorino and Burk never informed Oliver of this fact, and never attempted to either arrest Oliver or "Baker Act" Oliver at any time during the entire incident.

Officer Burk approached Oliver, who was still standing in the median, to ask him for his name and identification. Oliver complied, giving Burk his identification card. Burk then decided to coax Oliver across the Eastbound side of the street (across the blocked turning lane and the other lanes) to the sidewalk, so that they could talk when he saw there was "no traffic at all," and once the light turned red. Burk attempted to do so by putting his right hand on Oliver's left shoulder. Oliver responded by trying to back away. Oliver then "momentarily stopped" in the blocked turning lane of the street and began to babble incoherently. When the light

5

changed and the traffic (if any) in the other lanes began to move again,[1] Burk tried to force Oliver across the street, but Oliver struggled and pulled away from him.

During the encounter, Burk held on to Oliver's shirt as Oliver attempted to walk away across the street. At this point, Oliver did not try to grab Burk or to swing at him. Fiorino nevertheless, and without warning, tased Oliver for the first time.

Fiorino was using a Taser M26 Electronic 10 Control Device, which was "designed to cause significant, uncontrollable muscle contractions capable of incapacitating even the most focused and aggressive combatants." [Doc. 143-8 at 28]. "The [T]aser gun fires two probes up to a distance of twenty-one feet from a replaceable cartridge. These probes are connected to the [T]aser gun by high-voltage insulated wire. When the probes make contact with the target, the [T]aser gun transmits electrical pulses along the wires and into the body of the target, through up to two inches of clothing." Draper v. Reynolds, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004). The pulses are five seconds in duration, unless the trigger is held down longer than five seconds. [Doc. 142-43 at 70]. "Each 5-second cycle is a 'window of opportunity' for the arrest team to apprehend the subject and go hands on." Id. at 73.

---

[1]Officer Burk stated that he did not recall any traffic passing by, honking, or almost striking him or Oliver during the incident.

6

The Taser prongs from Officer Fiorino's first tase hit Oliver in his abdomen. According to Carl Hughley, this tase brought Oliver to the ground. While the Taser cycled through its five-second shock, Burk tried neither to handcuff Oliver nor to move him. This is so, despite the fact that, according to Hughley, once Oliver was on the pavement after the first tase, he never got back up, and he never hit, kicked, punched, or threatened the officers. Three to four seconds after the first Taser cycle ended, Fiorino tased Oliver once again. Ten seconds after the end of the second cycle, she tased Oliver still again for the third time.

After Oliver was shocked by the Taser, according to Hughley, Oliver was lying on the scorching hot asphalt screaming in pain that it was "too hot." Another bystander, Richandra Nelson, said that Oliver remained on the ground while Burk just stood there and watched Fiorino tase him. Both Nelson and Hughley witnessed Oliver attempting to get up from the ground, but said that they never saw him struggling with, hit, kick, punch, or threaten Burk in any manner. Hughley stated that when Oliver went down, he couldn't roll over. When he tried to sit up, he flopped down like a "wet cloth" because he had no control over his body.

After approximately the third or fourth tase, one of the Taser wires became disconnected from the Taser prong and stuck into Oliver's chest. Fiorino loaded a second cartridge into her Taser and began tasing Oliver again. This tase and the

7

next three or four tase cycles caused Oliver to be totally immobilized, leaving him clenched up and lying on his back. After the sixth or seventh tase, Oliver was again seen lying on the hot asphalt. Officer Fiorino said that when she tased Oliver for the last time (the eighth recorded tase), he was lying flat and he did not get up.

Fiorino said she was not sure how many times she tased Oliver, but that she just kept pulling the trigger until he stayed on the ground. She said that she believed she tased Oliver approximately eleven or twelve times. Fiorino's Taser log shows that she tased Oliver a total of eight times over a two-minute period as follows: (note that each tase lasts five seconds) 1) Tase at 14:18:19 (2:18:19 p.m.);2) Tase at 14:18:28 (2:18:28 p.m.); 3) Tase at 14:18:43 (2:18:43 p.m.); 4) Tase at 14:19:08 (2:19:08 p.m.); 5) Tase at 14:19:21 (2:19:21 p.m.); 6) Tase at 14:19:31 (2:19:31 p.m.); 7) Tase at 14:19:38 (2:19:38 p.m.); and 8) Tase at 14:20:27 (2:20:27 p.m.).[2]

Nelson observed that once backup arrived at 3:24 p.m., the officers finally handcuffed Oliver. Fiorino stated that after Oliver was handcuffed, he began foaming at the mouth. It appeared as if Oliver's body had gone limp, but he still screamed in pain. After Officer Burk walked Oliver back to the median, Fiorino took some of the Taser prongs out of his body, but was unable to remove them all.

---

[2] The Taser had apparently not yet been adjusted for daylight savings time so that the Taser log reading at 14:18:19 (2:18 p.m.) should actually have read 15:18:19 (3:18 pm).

8

At 3:35 p.m., paramedics arrived on the scene. At that point, Oliver was handcuffed and seated on the median, awake but not talking. After Oliver was placed on a stretcher, Burk noticed that Oliver had blood in his mouth. As Oliver was placed in the ambulance, he sat straight up and began to have a seizure. His health deteriorated rapidly; his body temperature was measured at 107 degrees. Oliver was pronounced dead on June 1, 2004, at Florida Hospital.

An autopsy revealed that Oliver had low levels of cocaine in his system, but Dr. Rudner, Plaintiff's expert witness and forensic pathologist opined "to a reasonable degree of medical certainty" that Oliver died as a result of "ventricular dysrhythmia in conjunction with Rhabdomyolisis" as a result of "being struck by a Taser."

On December 11, 2006, Appellee Amy Shirley Oliver, on behalf of the estate of the deceased Anthony Carl Oliver, Sr., filed this amended complaint against Officers Fiorino and Burk, the city of Orlando, and Taser International (the maker of the Taser used in the incident). The claim charged Fiorino and Burk with having used excessive force (tasering him at least eight times), and ultimately killing him in violation of the Fourth Amendment.[3]

On June 16, 2008, Officers Fiorino and Burk sought summary judgment on

---

[3]The claims against the City of Orlando and Taser International are not currently before this Court.

9

the ground of qualified immunity. Soon thereafter, the district court denied the motion concluding on this fact pattern that the officers were not entitled to immunity. This timely interlocutory appeal followed.

II.

The only issue before us is whether Officers Fiorino and Burk are entitled to qualified immunity on the Fourth Amendment claim that they used excessive and unreasonable force by repeatedly tasering Oliver. "Summary judgment is appropriate if the evidence before the court shows that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." McCullough v. Antolini, 559 F.3d 1201, 1204 (11th Cir. 2009) (internal quotation marks omitted).

As we have recognized repeatedly, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. at 1205 (quoting Lee, 284 F.3d at 1193-94). The purpose of qualified immunity is to allow officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, Anderson v. Creighton, 483 U.S. 635, 638-39 (1987), "protecting from

suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee, 284 F.3d at 1194 (internal citation and quotation marks omitted).

"[T]o receive qualified immunity, an official must first establish that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" McCullough, 559 F.3d at 1205 (quoting Lee, 284 F.3d at 1194). "If the official was acting within the scope of his discretionary authority" -- and it is undisputed that Officers Burk and Fiorino were -- "the burden then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate." Id.

Under the qualified immunity standard recently rearticulated by the Supreme Court in Pearson v. Callahan, 129 S. Ct. 808 (2009), we are obliged to grant qualified immunity to a law enforcement officer unless the plaintiff can demonstrate: first, that the facts when viewed in a light most favorable to the plaintiff establish a constitutional violation; and, second, that the illegality of the officer's actions was "clearly established" at the time of the incident. Id. at 815-16, 818. As we noted in Lee, this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Lee, 284 F.3d at 1194.

In Pearson, the Supreme Court recognized that we are no longer required to conduct the qualified immunity analysis in the sequence articulated by Saucier v.

11

Katz, 533 U.S. 194 (2001); rather, we may now exercise our sound discretion to decide which prong of the inquiry to address first. Pearson, 129 S. Ct. at 818. We begin our analysis with the first question: whether under the facts viewed in a light most favorable to Oliver, the officers violated Oliver's Fourth Amendment rights.

A. Was there a constitutional violation?

The complaint says that Officers Burk and Fiorino used excessive and unreasonable force in violation of the Fourth Amendment when they shocked Oliver with a Taser at least eight, and as many as eleven or twelve times over a two-minute span, eventually causing his death. The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension. Graham v. Connor, 490 U.S. 386, 394-95 (1989); Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005). We analyze a claim of excessive force under the Fourth Amendment's "objective reasonableness" standard. Graham, 490 U.S. at 388. In order to determine whether the use of force is "objectively reasonable," we carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake" under the facts of the particular case. Id. at 396 (internal citations and quotations omitted). We measure the quantum of force employed against these factors -- the

12

severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight. Lee, 284 F.3d at 1197-98. Notably, we consider the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir. 2004), recognizing that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

In Draper v. Reynolds, we addressed the use of a Taser shock in the course of an arrest. 369 F.3d at 1270. In that case, we concluded that where the police had used a single Taser shock against a "hostile, belligerent, and uncooperative" suspect, not causing any serious injury and leaving the suspect "coherent" and "calmed" shortly after the shock, the force used was proportionate and reasonable. Id. at 1278. We observed that under the facts of the case, "the single use of the [T]aser gun may well have prevented a physical struggle and serious harm to either [the suspect] or [the officer]," and, therefore, "[u]nder the 'totality of the circumstances,' [the officer's] use of the [T]aser gun did not constitute excessive

13

force." Id.

In this case, appellee has conceded that when Oliver struggled to free himself from Officer Burk in the street, he at least arguably placed himself and Officer Burk in some danger, and therefore, under the rationale of Draper, the use of an initial, single Taser shock to calm the suspect may have been justified.

Here, however, the force used against Oliver did not end there. The officers did not merely shock Oliver once and then attempt to engage him, arrest him, or "Baker Act" him. Rather, again viewing the facts in a light most favorable to Oliver, the first shock brought Oliver down to the burning hot pavement. Without any warning or instruction to Oliver, Officer Fiorino then tased Oliver once again. Ten seconds later, she tased Oliver still again. When her Taser broke and lodged the Taser prongs in Oliver, she reloaded and tased him again. The first Taser shocks left Oliver unable to roll over, and when he tried to sit up, he flopped down like a "wet cloth" because he had no control over his body. Yet Officer Fiorino continued to tase him several more times over the next minute, leaving him totally immobilized and clenched up. He could not sit up, screaming in pain while lying on the burning hot pavement. Yet the officer tased him still again. When Fiorino tased Oliver for the final (and at least eighth) time, he was already lying on his back. By the time the ambulance came, blood was coming out of Oliver's mouth.

14

His body temperature rose to 107 degrees and he ultimately died as a result of the Taser shocks.

The justification for the repeated use of Taser force, at least beyond an initial Taser shock, was minimal. The plaintiff was not accused of or suspected of any crime, and indeed was not threatened with arrest or apprehension at any time prior to (or after) the use of force. The plaintiff posed no immediate threat of danger to officers beyond the moment of struggle with Officer Burk. He did not act belligerently toward the police officers, and he did not curse or yell at them. In fact, he was largely compliant and cooperative with the officers -- moving away from their vehicle when instructed, stopping and talking the first time he was requested to do so (even though not threatened with detainment), stopping when instructed, providing requested identification, and only attempting to disregard the officer and walk away when the officer attempted a "custodial touch" on Oliver's shoulder.

Moreover, the plaintiff did not pose a grave danger to others. While Oliver did stop in the street and may have attempted to cross the street against the light, viewing the facts in a light most favorable to Oliver, we may infer that Oliver was within the lane that was boxed in by the police cars, and thus not exposed to traffic during the incident. This inference is supported by Officer Burk's statement that the

15

entire incident occurred in "the safe area," that "none of this incident took place in the middle of the intersection," and that he did not recall any traffic passing by, honking, or almost striking him or Oliver during the incident. Finally, Oliver was not actively resisting arrest nor attempting to evade arrest by flight.

Quite simply, though the initial use of force (a single Taser shock) may have been justified, the repeated tasering of Oliver into and beyond his complete physical capitulation was grossly disproportionate to any threat posed and unreasonable under the circumstances. On this summary judgment record, Oliver has established a violation of the Fourth Amendment.

B) Was the right clearly established?

Even though the actions of Officers Fiorino and Burk violated the Constitution, we also must ask whether Oliver has shown that the right violated was clearly established at the time of the violation. Pearson, 129 U.S. at 814-15. The Supreme Court has declared that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. The relevant inquiry to determine whether a right is clearly established is to ask whether it would be "'sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" Wilson v. Layne, 526 U.S. 603, 615 (1999) (quoting Anderson, 483 U.S. at 639).

16

In order to determine whether a right is clearly established, we look to the precedent of the Supreme Court of the United States, this Court's precedent, and the pertinent state's supreme court precedent, interpreting and applying the law in similar circumstances. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007). "We have said many times that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'" Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000) (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)). However, in some cases, we may find that the right is clearly established, even in the absence of case law. One such instance is where the case is one of "obvious clarity" – i.e., where the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point. Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting Lee, 284 F.3d at 1199). Under this test, "the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in Graham and our own case law inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." Lee, 284 F.3d at 1199 (internal quotation marks omitted).

No decision from the United States Supreme Court, or from this Court, or

17

from the Florida Supreme Court, has clearly established that an officer's repeated use of a Taser constituted excessive force under circumstances like these. Indeed, neither the United States Supreme Court nor the Florida Supreme Court has even addressed the use of Tasers in an excessive force inquiry, and this Court has only squarely done so in one published decision, Draper v. Reynolds, 369 F.3d at 1270, which, as we have said, is not directly on all fours with this case. The question then boils down to this: whether it would be clear to every reasonable officer, even in the absence of case law, that the force used -- repeatedly tasering Oliver over a two-minute period without warning -- was excessive under the circumstances.

We agree with the district court's determination that the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful. The need for force was exceedingly limited. Again, Oliver was not accused of or suspected of any crime, let alone a violent one; he did not act belligerently or aggressively; he complied with most of the officers' directions; and he made no effort to flee.

Tasering the plaintiff at least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue the plaintiff -- including tasering Oliver while he was writhing in pain on the hot pavement and after he had gone limp and immobilized -- was so plainly

18

unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances. When measured against these facts, the officers violated a clearly established right.

The district court properly rejected qualified immunity for Officers Burk and Fiorino. Accordingly, we affirm.

**AFFIRMED**.