[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 1, 2010
JOHN LEY
CLERK

No. 09-16000

_____

D.C. Docket No. 07-00079-CV-IPJ

WILLIE BARNETT,

Plaintiff-Appellant,

versus

FLORENCE, ALABAMA, CITY OF,
RANDALL HOLT,
JEREMY KEATON,
JEFF STANFIELD,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(December 1, 2010)

Before BLACK, MARTIN and COX, Circuit Judges.

PER CURIAM:

Willie Barnett filed a 42 U.S.C. § 1983 action against three City of Florence,

Alabama police officers in their individual capacity, alleging that the officers violated

the Fourth Amendment by illegally seizing him and subjecting him to excessive force.[1] The district court granted summary judgment in favor of the three officers, finding that reasonable suspicion supported the *Terry* stop at issue and that qualified immunity protected the officers against the excessive-force claim. After careful review of the record, including the videotape of the alleged incident, and having the benefit of oral argument, we affirm.

We review a district court's grant of summary judgment de novo; and we view the evidence and all reasonable factual inferences in the light most favorable to Barnett, the nonmoving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

Around 11:20 p.m. on April 22, 2006, Officer Randall Holt, Officer Jeremy Keeton, and Sergeant Jeff Stanfield received a dispatch call reporting that a gun fight had occurred at a public housing project. While the officers were traveling to the scene, they received a radio call stating that one person and one firearm were in custody. Upon arrival, Holt and Keeton saw Barnett walking away from the general area where shots previously were fired. As he was walking away from the scene, Barnett looked continuously over his shoulder at Holt's police car. According to

---

[1] Barnett does not challenge on this appeal the dismissal of his claims against the City of Florence.

Barnett, he was walking to his girlfriend's apartment after confirming that his girlfriend's granddaughter was not harmed by the shooting. When Holt shined the police-car spotlight toward Barnett, Barnett stopped, raised his hands in the air, and said, "I ain't the one baby. I ain't the one." (R.34, #13 at 2.) Pointing back in the direction from which he had just come, Barnett said "That's who y'all want." (R.34, #5.) Holt responded that he wanted to check and make sure that Barnett was not "the one." (Id.) Holt and Keeton then stopped Barnett, frisked him, and found no weapons. At this time, only several minutes had passed since the officers had received reports of the gun fight.

During the stop, Barnett was cursing and combative. With the strong odor of alcohol on his breath, Barnett used many profanities, including telling the officers not to "fuck" with him. (Id.) Barnett was so combative during the pat down that he had to be physically restrained. At one point, Barnett told Holt, "We done rumbled once, don't do this." (Id.) Holt perceived this statement as a threat. After the pat down, Holt handed Barnett's wallet to Stanfield so that he could check his identification.

After the license check revealed no outstanding warrants, the officers intended to let Barnett leave. But when Holt released Barnett's right arm, Barnett jerked it away, called Holt a "motherfucker," and took a step or two towards Holt. Based on

3

these actions, Keeton thought Barnett was going to attack Holt, so Keeton pushed Barnett away from Holt and told him to leave.

Barnett did not leave. Instead, he shoved Keeton back, and Keeton responded by grabbing Barnett and pushing him forcefully against the police car in an effort to arrest him. After being pushed against the police car, Barnett continued to resist, so Keeton took Barnett to the ground to gain control. The video does not capture any of the struggle on the ground because it occurred behind another police car. Nonetheless, the audio on the video indicates that Barnett continued to resist arrest even after being pushed to the ground. Because of this resistance, Holt and Stanfield dropped to assist Keeton. Stanfield, however, stood up almost immediately and moved back because he felt he was more hindrance than help to Keeton and Holt, who were both on the ground trying to wrestle Barnett's arms to the small of his back so they could put him in handcuffs. During this time, Holt commanded Barnett to "Stop Resisting!" several times, but Barnett continued to struggle. Holt was eventually able to gain control of Barnett's right arm. While Keeton was putting Barnett's left arm to the small of his back to handcuff him, Barnett felt his left elbow "pop." The entire incident, from the first push to the final handcuffing, lasted about one minute.

According to Barnett's version of events, which at the summary judgment stage we accept as true, Keeton extended Barnett's left arm straight out to his side and dislocated it by stomping on it in this extended position. Barnett also testified that, although he was resisting throughout the incident, at the time of the stomping, Keeton had control of his arm. And, Barnett submitted medical testimony that established he suffered a lateral dislocation, an uncommon injury caused by a "high energy" impact and "a severe torque."

A. Illegal Seizure

Barnett contends the district court erred in granting summary judgment on his illegal-seizure claim. He argues that the three officers violated the Fourth Amendment because they did not have reason to suspect that he was engaged in criminal activity. And, even if reasonable suspicion justified the initial stop, Barnett argues that his continued detention, after the frisk revealed no weapons, violated the Fourth Amendment because the justification for the stop had ended.

An officer may conduct a brief, warrantless, investigatory stop of an individual when the officer has a reasonable articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884 (1968); *see also United States v. Hunter*, 291 F.3d 1302, 1307 (11th Cir. 2002). "The concept of reasonable suspicion is somewhat abstract, but this much is clear: we must consider the totality of the

5

circumstances and determine for ourselves whether [the officers] had a particularized and objective basis for suspecting wrongdoing." *United States v. Williams*, 619 F.3d 1269, 1271 (11th Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002)) (internal quotations omitted). "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (citing *Arvizu*, 534 U.S. at 274, 122 S. Ct. at 751).

The district court correctly determined that the initial *Terry* stop and the duration of the stop did not violate Barnett's Fourth Amendment rights. As for the initial stop, the three officers were responding to a specific dispatch call indicating that a specific gun fight had just occurred in a high-crime housing project at night. Immediately upon arrival at the scene, the officers spotted Barnett walking away from the area where gun shots had been fired, and he was continuously looking over his shoulder when Holt arrived in his patrol car. It was reasonable to stop Barnett and investigate his potential role in the shooting. *See Williams*, 619 F.3d at 1271 ("When Officer Hunt saw a lone vehicle hurriedly pulling out of a high-crime housing project in the middle of the night within seconds of a gunshot, it was eminently reasonable of him to suspect that the car's occupants might have committed a crime."). The

district court also correctly concluded that the duration of the stop was reasonable. Barnett's continued detention for one or two minutes after the frisk revealed no weapons was reasonable in light of the threat that Barnett's combative behavior posed to officer safety. *See United States v. Kapperman*, 764 F.2d 786, 790-91 & n.4 (11th Cir. 1985) ("Police may take reasonable action, based upon the circumstances, to protect themselves during these [*Terry*] encounters, or to maintain the status quo.").

B. Excessive Force

Barnett argues that the district court erred in granting qualified immunity to all three officers on his excessive-force claim. He contends that, taking the facts in his favor, the force used by all three officers was excessive and violated clearly established law.[2]

The Fourth Amendment protects a person's right to be free from excessive force during arrest. *See Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). We evaluate the officers' actions for objective reasonableness. *See id.* "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

---

[2] It is undisputed that Sergeant Stanfield was not involved in the excessive-force incident. Although he initially attempted to help the other two officers in restraining Barnett, Sergeant Stanfield backed off before any of the allegedly excessive force occurred. As a result, we affirm the dismissal of the excessive-force claim asserted against Stanfield on the ground that no evidence suggests he participated in the use of force. In any event, our conclusion that Keeton and Holt's use of force did not violate clearly established law also applies to whatever force Stanfield did use.

motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989). All of the circumstances must be considered, including the type of crime at issue, whether the suspect posed an immediate safety threat, and whether the suspect was resisting arrest or was attempting to flee to evade arrest. *Id.* at 396, 109 S. Ct. at 1872. We view the circumstances from that of a reasonable officer on the scene, bearing in mind that "tense, uncertain, and rapidly evolving" circumstances often require "split-second judgments" about the appropriate use of necessary force. *Id.* at 396-97, 109 S. Ct. at 1872.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). A law enforcement officer is entitled to qualified immunity if "an objectively reasonable officer in the same situation could have believed that the force used was not excessive." *Id.* Qualified immunity from suit is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating

the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

Courts utilize a two-part framework to evaluate qualified immunity claims.[3] One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002) (citation omitted). If the facts, construed as they must be in this summary judgment appeal in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case. *Pearson v. Callahan*, 555 U.S. __, 129 S. Ct. 808, 821 (2009).

In this case, we need not address the first inquiry because, even if we were to assume that the use of force violated the Constitution, Barnett cannot demonstrate

---

[3] Prior to applying the two-part test, the initial inquiry in a qualified immunity case is whether the public official proves "that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (citation and internal quotation marks omitted). The parties do not contest that Holt, Keeton, and Stanfield were acting within the scope of their discretionary authority as law enforcement officers at the time of the incident.

that the law was so clearly established as to give the officers fair warning that the force used under these circumstances would have violated the Fourth Amendment.

A plaintiff can show that an officer's use of force violated clearly established law in two ways: (1) "a controlling and materially similar case declares the official's conduct unconstitutional;" or (2) "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (internal quotation and citation omitted).

Barnett first argues that *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997), is a controlling, materially similar case that clearly establishes the officers' use of force was excessive. In *Smith*, the plaintiff threatened officers in a drug sting with a baseball bat and then fled. *Id.* at 1418. He was later apprehended and, taking the facts in the plaintiff's favor, "docilely submitted to arrest" upon the officers' request for him to "get down." *Id.* After the plaintiff voluntarily laid on the ground and surrendered control of his arms to the arresting officer, the officer put his knee in the plaintiff's back to prepare to handcuff him. *Id.* In the process of pulling the plaintiff's left arm behind his back to fasten the handcuffs, the officer, "with a grunt and a blow," broke the plaintiff's arm. *Id.* We concluded that the unlawfulness of

10

this conduct was readily apparent even without clarifying case law. Crucial to our decision was the fact that the plaintiff was "offering no resistance at all," and thus the use of force that broke the plaintiff's arm was "obviously unnecessary to restrain even a previously fractious arrestee." *Id.* at 1420.

*Smith* is distinguishable from this case in a material respect and does not clearly establish that the defendant officers' use of force was excessive. Unlike the plaintiff in *Smith*, Barnett did not docilely submit to arrest but rather was continually resisting arrest until Keeton gained control of his left arm. This case, unlike *Smith*, involves the use of force that occurred during a continual physical struggle lasting less than a minute. *Smith* does not clearly establish that the officers' conduct was unconstitutional.[4]

We also reject Barnett's alternative contention that this case involves conduct that is obviously unconsitutional even without a materially similar case. To show that a defendant's conduct is obviously unconstitutional, a plaintiff must show that the official's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even

---

[4] Barnett also argues that this case "resembles" *Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008). To the extent Barnett contends that *Reese* is a materially similar case declaring the defendant officers' use of force unconstitutional, we disagree. In *Reese*, the plaintiff did not pose an immediate threat of harm to anyone and was not actively resisting arrest. *Id.* at 1274. Unlike *Reese*, Barnett did pose a threat of harm to the officers and was actively resisting arrest.

without caselaw on point." *Id.* at 1419. "This test entails determining whether 'application of the [excessive-force] standard would inevitably lead every reasonable officer in [the Defendants'] position to conclude the force was unlawful.' "*Priester*, 208 F.3d at 926-27 (citing *Smith*, 127 F.3d at 1419). Considering Barnett's combative nature, his persistent resistance, and his multiple verbal threats, we cannot say that the use of force in this case would lead every reasonable officer in the Defendants' position to conclude that the force was unlawful.

AFFIRMED.