[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14343
Non-Argument Calendar
_____

D.C. Docket No. 4:14-cv-00292-MW-CAS


JAMES BOYNTON,

                                                    Plaintiff-Appellant,

versus

CITY OF TALLAHASSEE,
LINDSEY CAMERON,
CURTIS NORTON,
WAYNE ELLISON,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(May 24, 2016)

Before ED CARNES, Chief Judge, WILLIAM PRYOR, and FAY, Circuit Judges.

PER CURIAM:

James E. Boynton suffered a diabetic seizure in a Tallahassee, Florida grocery store.  During the emergency medical response that followed, a police officer tased him multiple times.  Boynton filed this lawsuit against that officer, two medics, and the City of Tallahassee, claiming that the incident violated his statutory and constitutional rights.  The district court dismissed some of his claims and granted summary judgment to the defendants on others.  This is Boynton's appeal.

**I.**

A.

Boynton is a Type I diabetic.  Although he has experienced diabetic seizures in the past, he does not wear a medical alert bracelet or anything else that would make others aware of his condition.  In 2010 he collapsed in the checkout line of a Winn Dixie Supermarket.  He has no memory of what happened right after he collapsed, but we know from witnesses that a store employee called 911.  Wayne Ellison and Lindsay Cameron, medics with Leon County Emergency Medical Services, responded around 1:12 p.m.  They put Boynton, who was largely unresponsive, onto a stretcher and took him outside to their ambulance.

Boynton regained consciousness in the ambulance.  Cameron asked him if he had used any illegal drugs, and he told her that he had not.  He did not tell the medics that he was a diabetic, but he did ask them for a candy bar or something

2

sweet.  According to Boynton, Ellison responded by telling him that he was "about to be Baker Acted" — that is, taken into custody for an involuntary psychiatric observation under Florida law.  That frightened Boynton, and he tried to leave the ambulance.  When the medics tried to stop him, Boynton physically resisted them and a struggle ensued.

After a minute or two, the medics decided to exit the ambulance and call for help from law enforcement.  A police dispatcher contacted Curtis Norton, a police officer for the City of Tallahassee, and told him to "proceed to the scene with lights and siren because of a combative patient inside an ambulance."  When Norton arrived around 1:24 p.m., Cameron told him she thought Boynton might be "on illegal drugs."  Norton entered the ambulance and found Boynton lying on the floor, wedged between the stretcher and the ambulance wall, clinging to the bottom of the stretcher.[1]  Norton told him to get onto the stretcher for treatment.  Boynton

---

[1] In its order granting summary judgment to the defendants, the district court prefaced its account of the facts as follows:

> Mr. Boynton was at a Winn-Dixie when he experienced a hypoglycemic episode that distorted his conduct and triggered an emergency medical response in which he was eventually tased. Unfortunately, Mr. Boynton does not remember much of it. The last thing he remembers before going into hypoglycemic shock is standing in line at the Winn-Dixie. He did not regain consciousness until he was in the back of the ambulance.  And so, the details of what happened in between come from the Defendants. This section nonetheless pieces together what Mr. Boynton does remember and construes the evidence in the light most favorable to him.

Doc. 94 at 2-3 (citations omitted).  The parties in their briefs to this Court rely primarily on Norton's recollection of what happened after he arrived.  For the purposes of this appeal, we will accept the agreed-upon facts from the parties' briefs.

responded with "slurred words that [Norton] couldn't understand," but he did not move.  Norton decided to take Boynton into "protective custody," but he did not tell Boynton that.  He hoisted Boynton onto the stretcher, where he lay on his stomach with his arms tucked under his body and his head facing the ambulance door.  Norton ordered him to flip onto his back and turn around so that the medics could treat him, but Boynton once again did not move.  Norton tried to move Boynton himself, but he was unable to get a solid grip because Boynton repeatedly "tens[ed] his arms and pull[ed] them close to his body."  At that point, Norton decided to use his taser as a stun gun to "get control of [Boynton] so that he could be medically treated."  He did not give any verbal warning before using his taser.

When Norton tased him, Boynton "flopped" between the stretcher and the ambulance floor.  Cameron, who was standing just outside, observed Boynton "screaming," "yelling," "jerking," and "go[ing] limp."  According to Cameron, Boynton also said, "Okay, man, okay, man," and "Okay, I'll get up," after Norton first tased him.  When Boynton did not move onto the stretcher right away, Norton tased him eight more times — for a total of nine taser shocks cumulatively lasting 49 seconds.[2]

Boynton eventually complied with Norton's order to lie on his back on the stretcher.  Norton then holstered his taser and handcuffed Boynton to the stretcher.

---

[2] The record does not disclose the total amount of time that elapsed from the first shock through the ninth.

The medics returned to the ambulance, and Cameron began driving to the hospital while Ellison resumed his assessment of Boynton's condition.  He discovered that Boynton's blood sugar was low and administered intravenous dextrose around 1:30 p.m.  Boynton was treated and released from the hospital; he was not charged with any crime.  He alleges that being tased nine times caused neurological damage to his lumbar spine, resulting in pain and numbness in his right leg.

### B.

Boynton filed this lawsuit against the City of Tallahassee, Ellison, Cameron, and Norton.  In his third amended complaint, which is the operative one for purposes of this appeal, Boynton asserted four federal claims: (1) a deliberate indifference claim against Ellison, Cameron, and Norton under 42 U.S.C. § 1983; (2) an excessive force claim against Norton under § 1983; (3) a municipal liability claim against the City under § 1983; and (4) a discrimination claim against the City under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794.  He also asserted several state law claims.

The district court dismissed Boynton's discrimination claim under Rule 12(b)(6) and his § 1983 deliberate indifference claim against Norton on the basis of qualified immunity.  The court later granted summary judgment to the defendants on Boynton's remaining § 1983 claims.  It held that the defendants had not violated

5

any constitutional right, and that, if they had, they would be entitled to qualified immunity.  The district court declined to exercise supplemental jurisdiction over Boynton's state law claims and dismissed them without prejudice.[3]  He appealed.

## II.

Boynton first challenges the dismissal of his ADA and RA discrimination claims against the City.  We review de novo the dismissal of a claim under Rule 12(b)(6), "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff."  Butler v. Sheriff of Palm Beach Cty., 685 F.3d 1261, 1265 (11th Cir. 2012).  To survive a motion to dismiss, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  We will affirm the district court's dismissal of a claim for any reason supported by the record.  Allen v. USAA Cas. Ins. Co., 790 F.3d 1274, 1278 (11th Cir. 2015).

The ADA and the RA prevent public entities and the recipients of federal funding from discriminating against disabled individuals.  See Barnes v. Gorman, 536 U.S. 181, 184–85, 122 S. Ct. 2097, 2100 (2002).  To state a claim for

---

[3] Boynton does not appeal the dismissal without prejudice of his state law claims apart from appealing the dismissal of all his claims.

compensatory damages under either statute,[4] a private plaintiff must show that the defendant acted "with discriminatory intent." McCullum v. Orlando Reg. Healthcare Sys., Inc., 768 F.3d 1135, 1146–47 (11th Cir. 2014); see Delano-Pyle v. Victoria Cty., Tex., 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination."). That requires proof the defendant either intentionally discriminated against the plaintiff or was "deliberately indifferent to his statutory rights." McCullum, 768 F.3d at 1147 (quotation marks omitted). "To establish deliberate indifference, a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." Id. (quotation marks and alteration omitted).

In his third amended complaint, Boynton asserts that Norton's actions were "intentional and/or deliberately indifferent" to his rights under the ADA and the RA. But he does not allege any factual basis for that conclusion. See Randall v. Scott, 610 F.3d 701, 709–10 (11th Cir. 2010) (explaining that a legal conclusion must be supported by factual allegations to survive a motion to dismiss). Boynton alleges only that Norton should have recognized his erratic behavior as "consistent with [an individual] suffering a diabetic crisis." But that does not suggest Norton

---

[4] Boynton sought both compensatory and punitive damages, but punitive damages are not available in private suits under either statute. See Barnes, 536 U.S. at 189, 122 S. Ct. at 2103.

actually knew that Boynton was disabled or knew that his actions were substantially likely to violate Boynton's rights under the ADA or the RA. See McCullum, 768 F.3d at 1147. Because he has not alleged any facts showing that Norton acted intentionally or with deliberate indifference, we affirm the dismissal of Boynton's statutory discrimination claims.

### III.

Boynton next challenges the district court's grant of summary judgment to the defendants on his constitutional claims under § 1983. "We review de novo a district court's grant of summary judgment," drawing "all inferences and review[ing] all evidence in the light most favorable to the non-moving party." Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012). "Summary judgment is appropriate when the record discloses no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998). We "will affirm a grant of summary judgment if it is correct for any reason." United States v. $121,100.00 in U.S. Currency, 999 F.2d 1503, 1507 (11th Cir. 1993).

### A.

Boynton first contends that medics Ellison and Cameron treated his medical needs with deliberate indifference in violation of the Fourteenth Amendment. To prevail on that claim, he must show (1) an objectively serious medical need; (2) the

8

medics' deliberate indifference to that need; and (3) that their indifference caused his injuries.[5]  See Gilmore v. Hodges, 738 F.3d 266, 273–74 (11th Cir. 2013).  To prove deliberate indifference, Boynton must establish that the medics "subjectively knew of and disregarded the risk of serious harm, and acted with more than mere negligence."  Id. at 274.

Nothing in the record suggests that the medics knowingly disregarded any risk associated with Boynton's diabetes.  As soon as they tested his blood sugar and found that it was low, they treated him with intravenous dextrose. That was an effective course of treatment, and Boynton finds no fault with it.  He appears to argue, however, that the medics might have been able to treat him more quickly if they had not stopped to call for assistance from law enforcement.  In some cases, evidence that a defendant delayed medical treatment can support a deliberate indifference claim, "depend[ing] on the nature of the medical need and the reason for the delay."  Harris v. Coweta Cty., 21 F.3d 388, 393–94 (11th Cir. 1994).  This is not one of those cases.  The medics began to assess Boynton as soon as they arrived, and they withdrew and called for help only after he physically resisted them.  After Norton's intervention, the medics resumed their efforts right away. Given the circumstances, no reasonable juror could conclude that the medics

---

[5] Boynton must also show that he was in state custody while being treated.  See Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1034–35 (11th Cir. 1987).  The parties dispute that issue, but because his claim fails on other grounds, we do not address it.

treated Boynton's medical needs with indifference, much less deliberate indifference.[6]

## B.

Boynton next contends that Norton used excessive force when he repeatedly tased him. "We analyze a claim of excessive force under the Fourth Amendment's 'objective reasonableness' standard." Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009) (citation omitted). To decide whether the force used was reasonable, we examine "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Draper v. Reynolds, 369 F.3d 1270, 1277–78 (11th Cir. 2004) (footnote omitted). The amount of force used must be "reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Id. at 1277 n.13. We consider the totality of the circumstances from the perspective of a reasonable officer on the scene, not "with the 20/20 vision of hindsight." Oliver, 586 F.3d at 905 (quotation marks omitted).

---

[6] Boynton also argues that the medics should be held liable for the injuries he suffered when Norton tased him because, he claims, Cameron lied to Norton about Boynton's drug use, which influenced Norton's decision to tase him. What Cameron actually said is that she thought Boynton might be on illegal drugs. The evidence that Boynton points to would not support a reasonable inference that Cameron did not have a good faith belief that Boynton was on illegal drugs. See Ave. CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287, 1294 (11th Cir. 2013) ("All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable.").

When we view the evidence in the light most favorable to Boynton, Norton's use of force appears to be excessive. He did respond to a call about a "combative" medical patient, but by the time he arrived Boynton was not combative at all. In fact, he was barely responsive, lying immobile on the floor of the ambulance. When Norton told him to get onto the stretcher, Boynton did not move, but he also did not struggle or argue when Norton moved him. Norton admits that the only "resistance" he encountered was when Boynton "tensed" his body, making it difficult for him to reposition Boynton on the stretcher. In response, Norton tased Boynton nine times, eight of which were after Boynton had agreed to comply with Norton's demands. Based on those facts, a reasonable juror could conclude that Norton's use of force was disproportionate to any threat Boynton posed and was unreasonably excessive under the circumstances.

Norton emphasizes that the police department's use of force policy allows officers to use a "stun gun" on suspects who exhibit "active physical resistance," which is defined to include "bracing or tensing." Two things about that. First, that policy does not guide our analysis — the Fourth Amendment does. Second, we do not suggest that "tensing" will never justify the use of a stun gun or taser under any circumstances. We hold only that from the evidence in the record a jury could find Norton's use of a taser on Boynton nine times was unreasonable under the circumstances.

11

Norton contends that he is nonetheless entitled to qualified immunity, which protects government officials acting within their discretionary authority unless they violate a "clearly established" right. Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002). The parties agree that Norton was acting within his discretionary authority. To decide whether a right is "clearly established," we consider whether, based on the law applicable at the time of the alleged violation, it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). When this incident occurred in 2010, it would have been.

In 2009 this Court considered the reasonableness of an officer's repeated use of a taser on an individual who was not accused of any crime; who did not pose an immediate threat to the officer or others; who was not belligerent or aggressive; and who was not trying to flee or evade arrest. Oliver, 586 F.3d at 906–07. The officer in Oliver deployed her taser "at least eight and as many as eleven or twelve times," even after the individual was "immobilized," "limp," and "writhing in pain." Id. at 908. Under those circumstances, we held that the officer was not entitled to qualified immunity because the force used was "so plainly unnecessary and disproportionate that no reasonable officer could have thought that [it] was legal." Id. In light of Oliver, a reasonable officer in Norton's position would have known that repeatedly tasing Boynton, who was not argumentative, aggressive, or

12

mobile, was unreasonable under the Fourth Amendment. Norton is not entitled to qualified immunity on Boynton's excessive force claim at this time.[7]

### C.

Finally, Boynton contends that the City is liable for Norton's use of excessive force. "To establish the liability of a city or county under section 1983, the plaintiff must show that [his] constitutional deprivation resulted from a custom, policy, or practice of the municipality." Wideman, 826 F.2d at 1032. Boynton tries to do that in two ways: First, he argues that the police department's policies condone the use of excessive force. Second, he argues that the police department failed to adequately train Norton. Both arguments fail.

In 2010 the Tallahassee police department's electronic control device policy provided that the "decision to deploy [a taser] shall involve an arrest or custodial situation during which the [subject] escalates resistance . . . from passive physical resistance to active physical resistance and the subject: (1) [h]as the apparent ability to physically threaten the officer or others, or (2) [i]s preparing to, or is attempting to, flee or escape." The department's force continuum, in turn, defines "active physical resistance" as "physically evasive movements to defeat the

---

[7] We note that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Oliver, 586 F.3d at 901 (quotation marks omitted). We hold only that the facts presented to us, when viewed in the light most favorable to Boynton, do not support Norton's claim of qualified immunity. The evidence at trial may, of course, prove otherwise. The district court can revisit the qualified immunity issue if it becomes appropriate to do so.

13

officer's attempt at control," including "bracing or tensing, attempts to push or pull away, running away, or not allowing the officer to get closer." When a suspect displays active physical resistance, an officer can "appl[y] a baton, stun gun, or flashlight (used as an impact weapon) to control the suspect."

Boynton first asserts that the department's use of force policy encourages excessive force because it allows officers to use a taser in response to "bracing or tensing." As we have said, however, under a different set of facts, resistance like bracing or tensing might justify some limited use of a stun gun or taser. See, e.g., Draper, 369 F.3d at 1277–78 (holding that an officer's "single use of [a] taser" to gain control of a "hostile, belligerent, and uncooperative" suspect did not violate the Fourth Amendment). Not only that, but the policy provides that officers "are expected to use only that force reasonably necessary to effectively bring a suspect [or] incident under control." That cannot be interpreted as condoning the repeated tasing of an unresponsive medical patient lying face down on an ambulance stretcher.

Boynton also points out that the deputy police chief testified that the use of force policy "just addresses compliance." From that, Boynton argues that the department instructs its officers to continue applying force until a suspect complies with their orders, which, he says, results in the use of excessive force. But the deputy chief also testified that officers were only allowed to use force to gain

14

compliance "subject to reasonableness." Authorizing the continued use of reasonable force is not the same as authorizing the use of excessive force. In sum, Boynton has not shown that any department custom, policy, or practice endorsed or encouraged Norton's use of excessive force in this case.

Boynton also claims that the Tallahassee police department failed to adequately train Norton in the use of force involving tasers and in identifying medical emergencies like diabetic seizures. To hold a municipality liable under § 1983 for the failure to train its employees, the plaintiff must "present some evidence that the municipality knew of a need to train . . . in a particular area and the municipality made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (quotation marks omitted). Boynton has not provided any "evidence of a history of widespread prior abuse" in the department involving either the use of tasers or the identification of medical emergencies that would have put the City "on notice of the need for improved training and supervision" in those areas. Id. at 1351.

## IV.

We **AFFIRM** the district court's dismissal of Boynton's ADA and RA discrimination claims; the district court's grant of summary judgment to Ellison and Cameron on Boynton's § 1983 deliberate indifference claim; and its grant of summary judgment to the City on Boynton's § 1983 municipal liability claim. We

15

**REVERSE** the district court's grant of summary judgment to Norton on Boynton's § 1983 excessive force claim.  Because the dismissal of Boynton's state law claims was predicated on the judgment against him on all federal claims, we **REVERSE** the district court's dismissal of those state law claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**