[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13692
Non-Argument Calendar
_____

D.C. Docket No. 3:15-cv-00543-RH-CJK

RONALD W. JOHNSON,

Plaintiff-Appellee,

versus

SHAUN M. WHITE,
MATTHEW BEATY,
CHAD ROOP,
JESSICA WOOD,
PHILIP NIX,
MINDY VON ANSBACH YOUNG,
In their individual capacity as Escambia County
Sheriff's Officers, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 27, 2018)

Before WILLIAM PRYOR, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

Ronald Johnson brought this lawsuit against six deputies of the Escambia County Sheriff's Office in their individual capacities, alleging claims of excessive force, failure to intervene, and malicious prosecution under 42 U.S.C. § 1983. The defendant deputies are Shaun White, Matthew Beaty, Chad Roop, Jessica Wood, Philip Nix, and Mindy Von Ansbach Young.[1]

On the night of August 17, 2013, Johnson was arrested after two 13-year-old girls witnessed him expose his penis while he was urinating in a public parking lot next to his vehicle. One of their parents called the sheriff's office. Although arriving at various points, all six defendant deputies were ultimately present during the arrest, but defendant White was the arresting officer. The defendants filed a motion for summary judgment, which the district court denied. The defendants appeal the district court's ruling as to the denial of qualified immunity.

After review of the record, we affirm in part as to the excessive force claims against defendants White, Beaty, Roop, and Wood. We reverse as to the excessive force claims against defendants Nix and Young, the failure to intervene claims against all the defendants, and the malicious prosecution claim against defendant White.

---

[1] Officer Adam Narvaez was originally named as a defendant, but Johnson stipulated to dismissal of the claims against him during discovery.

2

## I.    BACKGROUND

### A.    Material Facts

We recount the facts taken from the depositions of Johnson, the wrecker operator, and the various deputies.

### 1.    Johnson's Conduct

In his deposition, Johnson stated that he is a practicing attorney who specializes in criminal defense and has been admitted to practice law in Florida since 1973.  At around 8:30 p.m. on the night of the arrest, Johnson was sitting in his Toyota Land Cruiser, which was located in a public parking lot on Pensacola Beach, Florida.  Johnson testified he was visiting some property he owns and decided to park in a lot across the street due to traffic at his neighbor's house.  Johnson admitted he drank two beers that night and had attended a social function on the beach for criminal defense attorneys.[2]

Once he arrived in the parking lot, Johnson stepped out of his vehicle "to use the bathroom."  Johnson admitted that he knew there was a portable toilet nearby when he decided to urinate on the pavement.  While he urinated, two young girls on bicycles saw Johnson's penis.  Johnson claimed he did not see anyone while he was urinating.  Once he was back in his vehicle, Johnson saw another vehicle enter

---

[2]Although officers later found one empty beer bottle and twenty-four unopened bottles in the vehicle, they never administered a breathalyzer test and never charged Johnson with an intoxication offense.

the parking lot and then noticed the two young girls with bicycles walking up the crossover from the beach. The two girls walked over to the other vehicle and notified one of their parents, who then contacted the Escambia County Sheriff's Office. Shortly after, law enforcement arrived at the parking lot.

## 2.    The Officers' Arrival and Interview with Witnesses

In his complaint, Johnson alleged that defendant Officer White was the first to arrive at the scene. The record evidence indicates, however, that Officers White, Roop, Beaty, and Adam Narvaez arrived simultaneously or within short succession of one another.[3] Upon arrival, these officers approached Johnson's vehicle and asked Johnson to identify himself and exit the vehicle. Johnson responded through the glass window but refused to step out of the vehicle or to answer any questions. Johnson told the officers it was a "citizen's encounter"[4] and that he did not have to get out of his car.

After Johnson refused, Officers White and Roop went to interview the witnesses. Officers Beaty and Narvaez stayed with Johnson's vehicle during the interview. Officer Roop was with Officer White and could hear White's conversation with the witnesses. Officer White spoke with the two girls, who

---

[3]Officer White was the primary officer on the scene while the others were present in a support capacity. It is not clear when Officer Wood arrived, although it was after Officer White and the others.

[4]In his deposition, Johnson explained that a citizen's encounter meant the officers "had no reason to ask [him] to get out of the car" and that "[t]hey had no probable cause to arrest [him] for any felony."

4

indicated that they saw Johnson going to the bathroom just outside his vehicle.[5]

Officer White testified that the two girls told him that Johnson "had a smirk on his face" or "a grin of some sort" and looked at them while urinating. Officer White also testified that the father of one of the girls pointed to Johnson's vehicle and said, "That's the man that exposed himself to my daughter." In his police report, Officer White included these details about the smirk. Officer Roop's deposition testimony corroborated this conversation with the girls. Specifically, Officer Roop testified the girls told Officer White that Johnson "didn't make no efforts to turn, and he smiled at them [the girls]."

In his deposition, Johnson later maintained that he did not smirk at the girls, but admitted that he did not hear White's interview with the two girls.

### 3.    The Call for Sergeant Nix

After the interview with the witnesses, Officers White and Roop then returned to Johnson's vehicle and repeatedly asked him to exit the vehicle. When Johnson continued to refuse, Officer White called for Sergeant Nix by radio. Not long after that, Sergeant Nix, accompanied by Sergeant Young, arrived at the

---

[5]Officer White testified that the two girls told him:

As they approached the walkover, they noticed a man standing with his back to his vehicle. As they got close, they noticed that he was standing urinating in the parking lot. They said they were about six or seven feet away when they noticed his exposed penis. At no time did he turn or try to hide his penis, but had a smirk on his face, which terrified them, and they immediately ran to the end of the boardwalk and called their father.

5

scene.  Officer White briefed Sergeant Nix on the nature of the complaint.

Sergeant Nix testified that Officer White told him "Johnson was urinating outside

the vehicle" and that when the two girls approached Johnson, he "made no attempt

to turn away from them, smirked at them, [and] continued urinating."  Then "[t]he

girls got scared and ran away."  Based on what Officer White told him, Sergeant

Nix, who had met Johnson previously,[6] testified that he believed there was

probable cause to arrest Johnson for lewd or lascivious exhibition.  After Officer

White briefed Sergeant Nix, the officers approached Johnson's vehicle.

In his complaint, Johnson alleged that the officers surrounded his vehicle

and told him that he was under arrest.  At approximately 9:00 p.m., after Johnson

continued to state that he did not consent to their investigation, Sergeant Nix

contacted a wrecker service to unlock Johnson's vehicle.  According to Johnson,

Sergeant Nix became impatient with Johnson's continued refusal to cooperate and

began to yell and use profanity.  Johnson became upset as well, calling the officers

"a bunch of cowboys" and "thugs" and telling them to "go shoot somebody else."

---

[6]Johnson testified that he had met Sergeant Nix previously during an incident that occurred near the boardwalk on Pensacola Beach.  According to Johnson, he asked Sergeant Nix to call a tow truck for a vehicle parked behind him, and Nix became belligerent.  Sergeant Nix testified that he knew Johnson before the arrest in this case and that he also knew Johnson was a lawyer.

### 4.    Attempts to Unlock the Vehicle

After the wrecker operator—Richard Carter—arrived on the scene at approximately 9:20 p.m., Carter attempted to unlock the passenger door of Johnson's vehicle with an "air wedge" and a "reach tool" but was thwarted by Johnson.  Johnson grabbed the reach tool and yanked on it so that the vehicle could not be unlocked.  In an effort to distract Johnson, Sergeant Nix and Officer Roop tapped on the windows and hood of Johnson's vehicle with their flashlights.  When this proved unsuccessful, Sergeant Nix warned Johnson that he was going to have to break the window if Johnson did not open the door.  Johnson refused, and Nix broke the window to the driver-side door.[7]

In his deposition, Carter testified that Johnson tried to get in the back seat of his vehicle when the officers broke the window.  Although Johnson conceded that it looked like he was retreating, Johnson claimed he "moved back" to avoid the shattering glass from the broken window.  Johnson testified that Sergeant Young then unlocked the car door, and Officer White opened it.  Carter testified that when "the locks were opened up, . . . that's when all the doors got opened, and all the deputies were all in there altogether."

---

[7]There is some dispute, albeit immaterial, as to whether Sergeant Nix used a flashlight or a baton to break the car window.  Sergeant Nix testified that he did not remember using a baton. Carter testified that Sergeant Nix tried to break the window with a flashlight and was unsuccessful, so he then took out a baton and shattered the driver-side window.

### 5.    Removal from the Vehicle by White, Beaty, and Roop

In his complaint, Johnson alleged that he was ripped from the vehicle, slammed on the ground, and beaten while he lay face down on the pavement. Although the evidence is in conflict, the version most favorable to the plaintiff is that these three defendants—Officers White, Beaty, and Roop—removed Johnson from the vehicle.

For example, Johnson testified that, while he was still in the vehicle, Officer White grabbed his right arm and Officer Roop grabbed his left arm and then they "ripped" Johnson out of the car and "flung" him to the ground. Roop, on the other hand, testified that it was White who removed Johnson from his vehicle and that, instead, Officer Roop stood behind Officer White and then handcuffed Johnson's left arm as Johnson went to the ground. Officer Roop claims he did not remove Johnson from the vehicle.

Officer White testified that he "reached in and placed [his] hands on [Johnson's] left arm to get him out of the vehicle." Officer White testified that Johnson snatched his hand away and said, "I'll get out when I want to," or something similar. Officer White then grabbed a "tighter hold of [Johnson] and tried to get him out of the car" and Johnson grabbed the steering wheel with his right hand.

8

Sergeant Young testified that Officers White and Beaty removed Johnson from the car.

In their depositions and reports, the officers agree that Johnson grabbed the steering wheel when Officer White and at least one other officer attempted to remove Johnson from the vehicle. Officer Wood testified that Johnson was "holding onto the steering wheel with both hands just as tight as he can . . . . [And] lean[ed] into the vehicle so that [officers could not] pull him out." Officer Wood and Sergeant Young each testified that Johnson positioned his feet underneath his seat and the brake pedals to anchor himself inside the vehicle.

Several officers stated that, once Johnson's hold on the steering wheel was broken, they attempted to remove Johnson from the vehicle but—because Johnson's shoes got caught inside the vehicle—Johnson fell to the pavement amid shattered glass from the broken window. Sergeant Nix testified that Johnson was "pulled from the car and directed to the ground," where he landed on his front side. In any event, Johnson's removal from the vehicle took only seconds.

Although Johnson admitted he was leaning back when Officer White reached for him, Johnson testified that he did not grab the steering wheel to prevent his being removed from the vehicle and that he did not fall but rather was "flung" or thrown to the ground. Sergeant Nix testified that Johnson continued to resist once he reached the ground.

9

**6.      Pinning and Striking on the Ground by Beaty and Wood**

When Johnson made contact with the ground, he claims that two unknown officers "jumped on [his] back," pinned him with their knees, and pushed his head into the asphalt.  According to Johnson, an unknown officer then "kicked" or "hit" him approximately two or three times on his right side.

Although Johnson could not identify the officers, Officers Beaty and Wood admitted to being the officers who put their knees in Johnson's back and struggled with Johnson on the ground.  But their version of what happened on the ground differs significantly from Johnson's.  Officers Beaty and Wood claim that Johnson was "flailing around" and initially attempted to roll onto his back.  Officer Wood testified that, once Johnson rolled over onto his back, she and another officer rolled Johnson back onto his stomach.[8]  According to Officer Beaty, once Johnson was turned onto his stomach, Officer Beaty placed a knee on the back of Johnson's shoulder to prevent him from "rolling around."  Likewise, Officer Wood placed her knee on Johnson's lower back "to keep him on the ground."  Johnson denied that he ever rolled over onto his back.

---

[8]Officer Wood could not identify the other officer.  Wood stated it could have been Beaty or Roop, but "[t]hey both have dark hair" and "it was kind of like in my peripheral."  Given Beaty's admitted involvement with Johnson on the ground and Wood's statement it could have been Beaty, Wood's testimony does not create an issue of fact as to Roop's involvement in the pinning and striking on the ground.

10

Officer Roop testified that Officers Beaty and Wood were trying to get Johnson's right arm out from underneath him. Officer Wood admitted that she struck Johnson on his right side three times with a closed fist, but contended that she did so to make Johnson release his right arm, which he had positioned underneath his body to avoid being handcuffed. Officer Wood also claimed that she did not touch Johnson until he was on the ground and rolled over onto his back.

Johnson admitted that his "right arm may have been under [him] at some point" when he fell but that his "left hand was cut on the underside," and so it was unlikely to have been under him as well.[9] The officers claim that after a few seconds of struggling, they were able to handcuff Johnson. Likewise, Johnson testified that he was handcuffed within "a matter of seconds" after landing on the ground.[10]

---

[9]As to what happened on the ground, Carter testified that Officer Wood straddled Johnson's rear end while she and two other male deputies attempted to pull Johnson's arms, which were positioned underneath his body, behind his back to be handcuffed. In his deposition, however, Carter did not identify the other deputies who were trying to handcuff Johnson. But again, Beaty admitted he pulled on Johnson's right arm and, according to Johnson, Roop had already grabbed Johnson's left arm while Johnson was in the car.

[10]Conversely, in his testimony, Carter speculated that the struggle on the ground lasted "somewhere between two and five minutes" but Carter also admitted: "I honestly couldn't tell you" and "I don't know exactly how long." Because of Carter's pronounced uncertainty about this fact, we accept Johnson's version of the events and Johnson's own testimony that the struggle on the ground lasted only "a matter of seconds." The officers agree that the struggle on the ground lasted only a few seconds.

11

### 7.    After the Handcuffing

According to Johnson, a few of the officers then picked him up off the ground, took him to the rear of a patrol car, and began "cleaning [him] up some." They bandaged Johnson's foot and called an ambulance. The ambulance "cleaned [him] up some more," and Johnson was placed in a patrol car. Officer White later took Johnson to Sacred Heart Hospital after Officer Roop signed a refusal form for transport by the ambulance. At the hospital, Johnson was handcuffed to a bed, received medical treatment, and was eventually released.

Along with cuts and bruises, Johnson sustained injuries to his left shoulder and both biceps requiring multiple medical visits. Johnson alleged that he suffered serious lacerations on his body, a torn shoulder, an injured back and neck, and a severed bicep muscle. In August 2013 and March 2014, respectively, Johnson required two surgeries to reattach and treat his right bicep, and he has still not regained full function. Johnson also underwent anesthesia to have his left shoulder put back in its socket and, in December 2013, had a surgery to repair his left shoulder.

### B.    Procedural History

At the time of the arrest, Officer White charged Johnson with felony lewd or lascivious exhibition, in violation of Florida Statutes § 800.04, and misdemeanor resisting an officer without violence, in violation of Florida Statutes § 843.02.

12

Ultimately, the lascivious exhibition charge was dismissed, and Johnson pled "no-contest" to a reduced misdemeanor charge of disorderly conduct, in violation of Florida Statutes § 877.03, with adjudication withheld.  On December 7, 2015, Johnson filed this lawsuit alleging excessive force and failure to intervene against each of the six deputies, as well as malicious prosecution against Officer White.

After discovery and depositions, the defendants filed a motion for summary judgment against Johnson's excessive force, failure to intervene, and malicious prosecution claims and asserted qualified immunity.

In a five-page order dated August 14, 2017, the district court denied the defendants' motion and found that genuine factual disputes precluded summary judgment for the defendants.  The district court concluded that the defendants were not entitled to qualified immunity because Johnson's account of the facts demonstrated that, as to excessive force, the officers violated clearly established law under Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989), and, as to malicious prosecution, Officer White violated clearly established law under Payne v. State, 463 So. 2d 271 (Fla. Dist. Ct. App. 1984).  On appeal, the defendants challenge the district court's denial of qualified immunity.

## II.   STANDARD OF REVIEW

We review de novo a district court's denial of a motion for summary judgment.  Stephens v. DeGiovanni, 852 F.3d 1298, 1313 (11th Cir. 2017); Fils v.

13

City of Aventura, 647 F.3d 1272, 1287 (11th Cir. 2011). A motion for summary judgment should be granted only when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To determine whether the movant is entitled to judgment as a matter of law, we review the record in the light most favorable to the nonmoving party and draw all justifiable inferences against the movant. See Stephens, 852 F.3d at 1313; Fils, 647 F.3d at 1287; Vinyard v. Wilson, 311 F.3d 1340, 1346 n.7 (11th Cir. 2002). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." See Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).

### III. DISCUSSION

#### A. Qualified Immunity

Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct is taken pursuant to their discretionary authority and does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." See Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (internal quotation marks omitted) (quoting Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001)). Whether the law is clearly established is not defined "at a high level of generality."

14

White v. Pauly, 580 U.S. __, __, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting

Ashcroft v. Al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 2084 (2011)).  Rather, in

all but the most obvious cases, the "clearly established law must be 'particularized'

to the facts of the case."  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640,

107 S. Ct. 3034, 3039 (1987)).

In determining whether a particular plaintiff's rights were clearly established

at the time of the violation, this Court "looks only to binding precedent—cases

from the United States Supreme Court, the Eleventh Circuit, and the highest court

of the state under which the claim arose."  Coffin v. Brandau, 642 F.3d 999, 1013

(11th Cir. 2011) (en banc); see Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1184

(11th Cir. 2009).

In this case, the deputies were clearly operating under their discretionary

authority.  See Lee, 284 F.3d at 1194 ("In this case, there can be no doubt that [the

officer] was acting in his discretionary capacity when he arrested [the plaintiff].");

Vinyard, 311 F.3d at 1346 ("Here, it is clear that [the officer] was acting within the

course and scope of his discretionary authority when he arrested [the plaintiff] and

transported her to jail.").  And so, we must assess (1) whether, in the light most

favorable to Johnson, the facts demonstrate that the officers violated Johnson's

constitutional rights, and (2) whether those constitutional rights were clearly

15

established at the time of Johnson's arrest. See Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003).

We analyze Johnson's excessive-force claims against the six deputies, his failure-to-intervene claims against them, and then his malicious prosecution claim against Officer White.

## B.    Excessive Force against All Deputies

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee, 284 F.3d at 1197; see Graham, 490 U.S. at 394–95, 109 S. Ct. at 1871. It is well established that claims for excessive force in the course of an arrest are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham, 490 U.S. at 395, 109 S. Ct. at 1871.

Proper application of this standard "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S. Ct. at 1872. That is, the force used to carry out an arrest must be "reasonably proportionate to the need for that force." Lee, 284 F.3d at 1198. The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with

16

the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872;

Vaughn v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003) ("We are loath to second-

guess the decisions made by police officers in the field.").

The Supreme Court has long recognized that "the right to make an arrest or

investigatory stop necessarily carries with it the right to use some degree of

physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396, 109, S.

Ct. at 1871–72. This Court has similarly embraced the notion that "some use of

force by a police officer when making a custodial arrest is necessary and altogether

lawful, regardless of the severity of the offense." Durruthy, 351 F.3d at 1094; see

Lee, 284 F.3d at 1197. Likewise, de minimis force is not actionable under § 1983.

See Vinyard, 311 F.3d at 1348 n.13.

Notwithstanding these principles, under the three factors noted in Graham as

well as this Court's own precedent, officers may not use substantial force to

apprehend a nonthreatening suspect who has committed only a minor offense and

is not resisting arrest. See 490 U.S. at 396, 109 S. Ct. at 1871–72; Hadley v.

Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) ("Our cases hold that gratuitous

use of force when a criminal suspect is not resisting arrest constitutes excessive

force.").

Here, Johnson contends that, without physically resisting at all, he was

forcibly removed from his vehicle, thrown to the ground, pinned down by the

17

officers' knees, had his face pushed into the asphalt, and was struck several times while face down. Although the officers dispute this narrative, we must view the evidence in a light most favorable to Johnson.

Under Johnson's version of the facts, he did not resist and the alleged instances of excessive force occurred at two points in time—(1) Johnson's forcible removal from the vehicle and (2) the pinning and striking of Johnson while he was face down on the ground and not resisting. The record, based on Johnson's account, reflects that defendant Officers White and Roop were involved in forcibly removing him from the vehicle, although Roop denies this.[11] According to Sergeant Young, White and Beaty removed Johnson from the vehicle. And, in the light most favorable to Johnson, defendants Wood and Beaty were involved in pinning and striking Johnson on the ground.

We recognize that factual disputes exist about whether Johnson fled or tried to flee to the back seat of his vehicle to evade arrest and resisted the officers by grabbing the steering wheel, by rolling over on the ground, and by placing his hands underneath his body to avoid handcuffing them together.[12] There is also a

---

[11]Officer Wood testified that Sergeant Nix may have been involved in removing Johnson from the vehicle, but she suspected it could just as well have been Officer Beaty, which is what Sergeant Young said. On its own, this testimony does not affirmatively establish that Sergeant Nix made contact with Johnson. Herrington, 381 F.3d at 1247 (stating that a mere "scintilla" of evidence is insufficient to overcome summary judgment).

[12]To the extent that Johnson argues (1) there was no probable cause for an arrest for violation of Florida Statutes § 800.04 and thus (2) any force used was unreasonable, this Court's precedent dictates that such a claim is not a discrete excessive-force claim but is a false arrest

18

factual dispute as to whether officers forcibly threw Johnson from the vehicle to the ground or whether his shoe got caught and caused him to fall. But under Johnson's version of the facts, he did not resist the removal from the vehicle or the handcuffing of either arm. Thus, the jury must decide what happened and whether defendants White, Wood, Beaty, and Roop used excessive force on a non-resisting suspect or used reasonable force given plaintiff's resistance to being arrested. On the other hand, no evidence shows that Sergeants Nix or Young physically touched Johnson during these events, and they are entitled to qualified immunity as to excessive force.

Accordingly, we conclude that the district court did not err in denying qualified immunity as to Johnson's excessive force claims against defendants White, Roop, Beaty, and Wood, but did err in denying qualified immunity as to the excessive force claims against defendants Nix and Young.[13]

---

claim. See Bashir v. Rockdale Cty., 445 F.3d 1323, 1331 (11th Cir. 2006). That is because a no-force-at-all claim is "dependent upon and inseparable from" an unlawful arrest claim. Id. at 1332. Admittedly, Johnson does not make an unlawful arrest claim. Therefore, we assess only whether the "quantum of force" used "in effecting an otherwise lawful arrest" was reasonable. Id.

[13]Although the parties' briefs address a spoliation issue, it is not properly before this Court on appeal. The defendants appealed with respect to qualified immunity on this record, and any allegations of spoliation do not weigh on that determination. However, since there is no video or audio recording of these events, the disputes hinge on credibility determinations between the testimony of Johnson, the wrecker operator, and the various deputies. Thus, this is not a case where the record contains documentary evidence that blatantly contradicts plaintiff's testimony so as to render it incredible and thus not worthy of favorable construal at the summary judgment phase. See Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007).

19

## C.    Failure to Intervene against All Deputies

Even if an officer personally did not use excessive force, an officer who is present at the scene can be alternatively liable for failing to take "reasonable steps to protect the victim of another officer's use of excessive force." Hadley, 526 F.3d at 1330 (quoting Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007)); Priester v. City of Riviera Beach, 208 F.3d 919, 924–25 (11th Cir. 2000) (finding officer liable on a failure to intervene theory).  However, an observing officer must have both the opportunity to intervene and be in a position to intervene and yet fail to do so.  Hadley, 526 F.3d at 1331.  Instances of force that occur within seconds do not place officers in a realistic position to intervene.  See id. (finding no evidence from which a reasonable jury could find that an officer could have anticipated and stopped another officer from punching the plaintiff once in the stomach).

In this case, the whole incident lasted only a few seconds and evolved rapidly once the car door was opened.  By Johnson's own testimony, both his removal from the vehicle and his handcuffing on the ground occurred within seconds.  Johnson has simply not presented evidence that any deputy, and specifically Sergeants Nix or Young, had an opportunity or was in a position to intervene but failed to do so.  See Hadley, 526 F.3d at 1331.  Johnson has not shown a constitutional violation with respect to any officers' alleged failure to

20

intervene.  Thus, even assuming an officer used excessive force in the moments Johnson was removed from the vehicle and handcuffed on the ground, the other officers are entitled to qualified immunity with respect to Johnson's separate failure to intervene claims.  Id.

Accordingly, the district court erred in denying qualified immunity to the six deputies as to Johnson's failure-to-intervene claims.

**D.    Malicious Prosecution against Officer White**

Johnson also asserts a malicious prosecution claim against Officer White. Johnson argues that Officer White knew that he lacked probable cause to charge Johnson with lewd or lascivious exhibition of his genitals, in violation of Florida Statutes § 800.04, and proceeded anyway.  Section 800.04 provides that a person who "[i]ntentionally exposes the genitals in a lewd or lascivious manner . . . in the presence of a victim who is less than 16 years of age, commits lewd or lascivious exhibition."  Fla. Stat. § 800.04(7)(a)2.  As to this claim, the district court erred in denying qualified immunity to Officer White.  We explain why.

"Our Court has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983."  Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003).  To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures, as well as the elements of

21

the common law tort of malicious prosecution under state law.  See id.; Uboh v.

Reno, 141 F.3d 1000, 1003–06 (11th Cir. 1998) (analyzing malicious prosecution

under Georgia law).

Under Florida law, a claim for malicious prosecution has the following six

elements:

> (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004) (emphasis

added).  Consistent with these elements, the existence of probable cause defeats a

§ 1983 claim for malicious prosecution.  Grider v. City of Auburn, 618 F.3d 1240,

1256 (11th Cir. 2010).  Probable cause exists when an arrest is objectively

reasonable based on the totality of the circumstances and the officer's knowledge

at that time.  Kingsland, 382 F.3d at 1226.

And for qualified immunity purposes, an officer needs only "arguable"

probable cause.  Grider, 618 F.3d at 1257 (quotation marks omitted).  Arguable

probable cause exists where a "reasonable officer[] in the same circumstances and

possessing the same knowledge as the Defendants could have believed that

22

probable cause existed to arrest Plaintiff." Id. (emphasis added) (quoting Kingsland, 382 F.3d at 1232).

Thus, the question here is whether Officer White had arguable probable cause to arrest Johnson for violation of § 800.04. Johnson does not dispute that he exposed his genitals in front of two minor girls. Rather, Johnson contends his exposure was only in a "urinating" posture—not in a lewd or lascivious manner—and therefore Officer White lacked probable cause to arrest him for violation of § 800.04. Johnson acknowledges that if he looked at the girls and "smirked," that would provide the necessary probable cause, but Johnson avers he did not smirk and testified he did not know the girls were there.

Here, the district court erred in ruling that factual disputes about whether Johnson actually "smirked" at the girls precluded qualified immunity. That was error because we look at what the girls told Officer White and not whether Johnson admits that conduct. According to Officer White, after he arrived at the scene, the two girls told him that Johnson "had a smirk on his face," looked at them while urinating, and did not try to cover himself or turn away. Officer White's hearing this information created at least arguable probable cause for him to believe that Johnson had exposed his penis in a lewd or lascivious manner. Officer White proceeded accordingly and included the girls' statements in his contemporaneous

23

report of the incident.  Although Johnson denies smirking and looking at the girls, our focus for qualified immunity is on what Officer White was told by the girls.

Johnson stresses that the two girls' written statements mention exposure of Johnson's private parts but do not mention a smirk.[14]  However, the girls' written statements do say that Johnson made no attempt to turn around or to cover himself when they rode up, facts from which White could infer that Johnson was acting in a lewd or lascivious manner.  Further, witnesses are not required to write out every detail of an incident and this omission of a "smirk" does not create a jury issue as to what the girls told Officer White at the scene.  See Rankin v. Evans, 133 F.3d 1425, 1441 (11th Cir. 1998) ("Generally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause.").  Importantly, the girls were not deposed and there is no evidence that they ever denied telling Officer White about Johnson's looking at them, smirking, and making no attempt to turn around or cover himself when they rode up.  Thus, in light of their uncontroverted verbal statements to Officer White at the scene, he had at least arguable probable cause to arrest Johnson for violation of § 800.04.

Alternatively, even assuming Johnson did not smirk and assuming the girls did not tell Officer White that he did smirk, the totality of the particular circumstances here still gave Officer White arguable probable cause to arrest

---

[14]We agree with Johnson that the girls' written statements in the record did not mention any smirk.

24

Johnson for violation of § 800.04.  See Grider, 618 F.3d at 1257.  Florida courts recognize that "a determination of the precise meaning of the words 'lewd and lascivious' in particular contexts must be developed on a case by case basis" and by using a "totality of the circumstances" analysis.  Egal v. State, 469 So. 2d 196, 197–98 (Fla. Dist. Ct. App. 1985).  Likewise, these same courts have noted that "conduct which in some circumstances might be purely innocent, such as nudity, can be found to be lewd and lascivious if accompanied by the requisite improper intent."  See id. at 198.

In this case, even in the absence of a smirk by Johnson, it is undisputed that Officer White was responding to a phone call by a parent about a man exposing his penis in front of two young girls, that Johnson actually exposed his penis, and that Johnson chose to urinate in a public parking lot with a portable toilet within 15 feet of his location.  A reasonably competent officer in Officer White's shoes, and in light of the information he possessed, could conclude that probable cause existed for a charge of a violation of § 800.04.

At a minimum, there was no clearly established law that would have given notice to Officer White that he lacked arguable probable cause to arrest Johnson for a violation of § 800.04.  As stated above, when considering whether a constitutional violation is clearly established, we look "only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and

25

the <u>highest court of the state</u> under which the claim arose." <u>Coffin</u>, 642 F.3d at 1013 (emphasis added); <u>Oliver v. Fiorino</u>, 586 F.3d 898, 907 (11th Cir. 2009) (finding law was not clearly established in Florida where plaintiff presented no decision from the Florida Supreme Court). Johnson points to no decision from the United States Supreme Court, this Court, or the Florida Supreme Court.

We recognize that Johnson cites and relies on the Florida appellate court's decision in <u>Payne v. State</u>, 463 So. 2d 271 (Fla. Dist. Ct. App. 1984), where the defendant urinated in a public parking lot and was charged with indecent exposure under Florida Statutes § 800.03—a different statute from this case. <u>Id.</u> at 271. Section 800.03 makes it unlawful to "expose or exhibit <u>one's sexual organs in public</u> . . . in a vulgar or indecent manner, or to be naked in public except in any place provided or set apart for that purpose." <u>See</u> Fla. Stat. § 800.03 (emphasis added). The Florida court found: (1) that a conviction for indecent exposure under § 800.03 requires a "lascivious exposure of a sexual organ;" (2) that "lascivious" meant "an unlawful indulgence in lust, eager for sexual indulgence;" and (3) that the defendant's conduct—simply urinating in public—did not, as a matter of law, constitute a violation of § 800.03. <u>Id.</u> at 271–72 (quoting <u>Cheesebrough v. State</u>, 255 So. 2d 675, 677 (Fla 1971)).

<u>Payne</u> involved § 800.03 and did not clearly establish law as to minors under the age of 16, which is the focus of § 800.04. <u>See</u> 463 So. 2d at 271. The Supreme

26

Court recently reiterated its "longstanding principle" that clearly established law is not defined "at a high level of generality." White, 580 U.S. at __, 137 S. Ct. at 551 (quoting Al-Kidd, 563 U.S. at 742, 131 S. Ct. at 2084). Rather, clearly established law must be "particularized" to the facts of the case. Id. (quotation marks omitted). Thus, the relevant inquiry is whether the alleged violation of a right is "sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Oliver, 586 F.3d at 907 (quoting Wilson v. Layne, 526 U.S. 603, 615, 119 S. Ct. 1692, 1699 (1999)).

In contrast to Payne, the present case involves a different statute and the exposure of genitals in a lewd or lascivious manner "in front of a victim who is less than 16 years of age," as prohibited in Florida Statutes § 800.04. Although Florida courts have read a lascivious element into the separate offense of indecent exposure under § 800.03, see Egal, 469 So. 2d at 198, this interpretation is insufficient to make the facts of Payne "clearly established law" for purposes of an offense under § 800.04 involving minors who report a person exposed his penis and did not turn away or attempt to cover himself. See Oliver, 586 F.3d at 907. Payne did not involve conduct within the close proximity of two young girls that was reported by a concerned parent about a man's exposure of his penis to children. See 463 So. 2d at 271. This factual distinction means that a reasonable

27

officer would not necessarily understand that what he was doing was unlawful. See Oliver, 586 F.3d at 907.

For all these reasons, we conclude that the district court erred in denying Officer White summary judgment based on qualified immunity as to Johnson's malicious prosecution claim against Officer White.

## IV.    CONCLUSION

We affirm the district court's denial of qualified immunity for defendants White, Roop, Beaty, and Wood as to Johnson's excessive force claims. We reverse the district court's denial of qualified immunity for defendants Nix and Young as to Johnson's excessive force claims, its denial of qualified immunity for all six deputies as to Johnson's failure to intervene claims, and its denial of qualified immunity for defendant White as to Johnson's malicious prosecution claim.  We vacate the district court's order to that extent and remand for a trial as to Johnson's excessive force claims against defendants White, Roop, Beaty, and Wood.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**