[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11569

_____

D.C. Docket No. 4:15-cv-01152-ACA

MICHELLE LEE HELM,
Individually and as Guardian and next friend of TDH, a minor child,

Plaintiff - Appellee,

versus

RAINBOW CITY, ALABAMA, et al.,

Defendants,

GREG CARROLL,
Chief of Police, Rainbow City, Alabama,
JAMES FAZEKAS,
Individually and in his official capacity as a member of the Rainbow City Police Department,
GEORGE MORRIS, Individually and in his official capacity as a member of the Rainbow City Police Department,
TIMOTHY KIMBROUGH,
JUSTIN GILLILAND,

Defendants - Appellants.

---

Appeals from the United States District Court
for the Northern District of Alabama

---

(March 10, 2021)

Before JORDAN, LAGOA, and BRASHER, Circuit Judges.

LAGOA, Circuit Judge:

At the age of fifteen, a moving car hit T.D.H. as she walked home from a friend's house.  T.D.H. sustained head trauma from the accident that now causes her to experience grand mal seizures, during which her body stiffens, her arms and legs flail, she spits and sometimes vomits, her eyes roll back, her head shakes rapidly, and she makes guttural noises.  When she comes out of a seizure, she does not know where she is or what is happening, and it usually takes her several minutes to become aware of her surroundings.  In the past, she has also experienced seizures that resulted in a catatonic state for up to two hours.

While attending a music concert with her younger sister and some friends, T.D.H. experienced several grand mal seizures.  During one seizure, a good Samaritan in the crowd picked T.D.H. up from the concert floor and took her to the lobby.  Some of the other individuals she encountered that night, however, were not as helpful.  This appeal stems from their actions that night.

I.    FACTUAL AND PROCEDURAL HISTORY

A.    Use of force against T.D.H.

2

On January 16, 2015, T.D.H.[1] attended a concert with her younger sister, D.S.H., and some friends at a venue located in Rainbow City, Alabama.  D.S.H. knew of T.D.H.'s condition and had been previously instructed by doctors on how to care for T.D.H. during her seizures.  During the concert, T.D.H. began having a grand mal seizure and fell to the floor.  In response, D.S.H. started holding T.D.H.'s head as she had been instructed to by the doctors.

Greg Carroll, the Rainbow City Chief of Police,[2] and Rainbow City Police Officers Timothy Kimbrough, Justin Gilliland, George Morris, and Jimmy Fazekas were at the concert that night providing security.  Officer Gilliland first spotted T.D.H. and approached T.D.H. and D.S.H.  D.S.H. told Officer Gilliland that T.D.H. was suffering from a seizure and needed help.  A man from the crowd picked up T.D.H. and carried her to the lobby of the concert venue, where she began seizing again as she sat in a chair.  D.S.H. told Officer Gilliland that T.D.H. was having another seizure.  Officer Gilliland, Chief Carroll, and Officers Fazekas and Kimbrough then held T.D.H. on the ground.  Officer Gilliland directed another officer to call for paramedics.

---

[1]  T.D.H. was seventeen years old on the date of the incident.

[2]  On the date of the incident—January 16, 2015—and at the time of the filing of the complaint, Carroll was the Chief of Police for Rainbow City.  Although he no longer serves in that capacity, we will refer to him by his title on the date of the incident.

As the officers held down T.D.H., Officer Morris entered the lobby and was told that T.D.H. was having seizures. Officer Morris, however, claims he did not hear anyone tell him about T.D.H.'s condition and instead encountered an "out of control female." Officer Morris then yelled at T.D.H.—while she was being held down by the other officers—telling her that if she did not calm down, he would tase her. Officer Morris unholstered his taser and waved it in front of T.D.H., repeating his threat. Chief Carroll and Officers Gilliland and Kimbrough heard and saw Officer Morris's threat. Officer Morris then bent down and tased T.D.H. in the chest using the "drive stun" mode, meaning that he pressed the taser directly on T.D.H. and released an electric current without using probes. Using a taser in drive stun mode is a "pain compliance tool" that, unlike when using a taser's electro-muscular disrupter probes, does not immobilize a person or disrupt that person's muscle control.

None of the officers attempted to stop Officer Morris from using his taser on T.D.H. After witnessing Officer Morris tase T.D.H., Chief Carroll remained in the lobby area for three to four minutes before leaving to place a call regarding the paramedics' arrival time. According to the district court's view of the record, Chief Carroll witnessed only one instance of Officer Morris tasing T.D.H.

Officer Morris yelled at T.D.H. to calm down or he would tase her again. Officer Morris tased T.D.H. in the chest a second time and then a third time, each

4

time using the drive stun mode while T.D.H. remained pinned down by four or five officers. T.D.H. blacked out and regained consciousness while on a gurney on the way to a hospital. T.D.H. was not arrested or charged with any crime.

Officers Kimbrough and Gilliland claim that, after her second seizure, T.D.H. cursed and spit at them, told them to let her go, and tried to kick and bite the officers, but D.S.H. maintains that T.D.H. never attempted to kick, bite, or spit at the officers and never yelled at the officers or used vulgar language. Similarly, T.D.H. testified that she blacked out during her first two seizures and remembers being held down by various officers and asking, "What is going on? Y'all let me go. I don't know what is going on but I cannot breathe," before blacking out again.

The officers do not dispute that T.D.H. presented no threat to them and, during the tasings, was held down by four or five men. The officers also do not dispute that, other than T.D.H.'s allegedly disorderly conduct while being held down, T.D.H. committed no crime and there was no reason to arrest her.

**B.    Use of force against Michelle Helm**

At some point that night, someone called Michelle Helm, T.D.H. and D.S.H.'s mother, and told her that T.D.H. was suffering seizures at the concert. Helm drove to the concert venue and, while approaching the entrance, saw a crowd of people around a female she assumed was her daughter. Helm saw T.D.H. on the floor seizing with various men holding her down. As Helm ran toward the venue, she

5

yelled, "that's my daughter, she's having a seizure," but an officer tackled her mid-sentence before she entered the lobby. Another officer handcuffed Helm with her arms behind her back and her face to the ground. While Helm lay handcuffed on the floor, Officer Morgan—a nonparty to this case—took out his taser and told Helm that he was going to tase her. Officer Morgan then tased Helm in the lower back using the drive stun mode, causing Helm to urinate on herself. None of the other named officers attempted to stop Officer Morgan from tasing Helm.

Officer Fazekas claims that, before witnessing Officer Morgan detain and tase Helm, he saw Officer Morgan grab Helm's arm to stop her and she pulled away from him. Officer Fazekas stated that he handcuffed Helm after Officer Morgan tased her. Moreover, Officer Fazekas contends that Helm first almost knocked him off his feet, pushed him off when he tried to grab her, and entered the concert venue while yelling and trying to remove the officers from T.D.H. This is disputed, as D.S.H. claims her mother was tackled outside of the concert venue and never made it inside. Helm was arrested for disorderly conduct and spent the night in jail. Rainbow City later dismissed the charge against Helm.

## C.    Case Proceedings

Helm brought this action under 42 U.S.C. § 1983 in her individual capacity and as guardian and next friend of T.D.H., a minor. Helm alleged multiple § 1983 claims, contending that Chief Carroll, the four named officers, and the City of

Rainbow City, Alabama violated her and T.D.H.'s constitutional rights to be free from the use of excessive force, failing to intervene in the use of that force, and falsely imprisoning and falsely arresting her and T.D.H. Helm also alleged that Rainbow City and Chief Carroll failed to appropriately train and supervise the other named officers.

After taking discovery, Chief Carroll and Officers Morris, Fazekas and Kimbrough jointly moved for summary judgment on all claims. As to Counts One, Two, Three, Five, Seven, Nine, Ten, Eleven, Twelve, and Thirteen, which asserted claims of excessive force and failure to intervene, Chief Carroll and Officers Morris, Fazekas and Kimbrough argued that they are entitled to qualified immunity. They also moved for summary judgment on the false imprisonment claims in Counts Twenty-One and Twenty-Two. Officer Gilliland filed a separate motion for summary judgment.[3] As to Counts Six and Eight, which asserted failure to intervene claims, Officer Gilliland likewise argued that he was entitled to qualified immunity.

Relevant to this appeal, the district court denied summary judgment on Counts One, Two, Five, Eight, Eleven, Twelve (in part), and Twenty-Two. Specifically, the district court rejected Officer Morris's argument that he was entitled to qualified

---

[3] Rainbow City also moved for summary judgment and the district court granted summary judgment in favor of Rainbow City and Chief Carroll on T.D.H. and Helm's claims for failure to appropriately train and supervise the other named officers (Counts Fourteen and Fifteen). The district court's order granting summary judgment on these counts in favor of Rainbow City and Chief Carroll are not before this Court, and we therefore do not address them.

immunity as to T.D.H.'s excessive force claim and further rejected Officer Morris's argument that record evidence did not support T.D.H.'s false imprisonment claim. As to Chief Carroll[4] and Officers Gilliland and Kimbrough, the district court found that they were not entitled to qualified immunity on T.D.H.'s claim that they failed to intervene in Officer Morris's use of excessive force. As to Officer Fazekas, the district court found that Fazekas was not entitled to qualified immunity for Helm's claims that he failed to intervene in Officer Morgan's use of force against her. This timely appeal ensued, and the district court stayed the case as to the remaining claims pending this appeal.

## II.    STANDARD OF REVIEW

This Court reviews *de novo* an order denying summary judgment based on qualified immunity. *See Glasscox v. City of Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). "When considering a motion for summary judgment, including one asserting qualified immunity, 'courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting

---

[4] As to Count Twelve, the district court denied summary judgment as to Chief Carroll on the first tasing of T.D.H. but granted summary judgment in favor of Chief Carroll and against T.D.H. as to the second and third tasings. That grant of summary judgement is not before us in this interlocutory appeal.

*Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)). "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

## III. ANALYSIS

On appeal, Chief Carroll and Officers Morris, Fazakas, Kimbrough, and Gilliland argue that the district court erred in denying them qualified immunity on the claims remaining in the case—Counts One, Two, Five, Eight, Eleven, Twelve (in part), and Twenty-Two. After reviewing the relevant legal framework, we will address T.D.H.'s claims followed by Helm's claims.

### A.    Qualified Immunity

In order to assert a qualified immunity defense, a government official must show that "he was acting within his discretionary authority" during the alleged wrongdoing. *Glasscox*, 903 F.3d at 1213 (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007)). If a government official makes this showing, the burden shifts to the plaintiff to show (1) that the government official violated a constitutional right and, if so, (2) that the constitutional right was clearly established at the time of the wrongdoing. *Id.*; *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). "'Clearly established' means that, at the time of the officer's conduct, '"the

9

law was sufficiently clear that every "reasonable official would understand that what he is doing"' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). An officer's unconstitutional use of force is therefore not actionable unless the officer was on notice that his or her actions were clearly unlawful. *Terrell*, 668 F.3d at 1250. A plaintiff has three ways to show that government officials were on notice regarding the constitutionality of their actions:

> *First*, the plaintiffs may show that a materially similar case has already been decided. *Second*, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. *Finally*, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

*Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (alteration and emphasis in original) (quoting *Terrell*, 668 F.3d at 1255–56).

Moreover, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000). The principle that an officer must intervene when he or she witnesses unconstitutional force has been clearly established in this Circuit for

10

decades. *Id.* at 927 ("That a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994."). When an officer witnesses another officer's excessive use of force and makes "no effort to intervene and stop the ongoing constitutional violation[,] . . . [the witnessing officer] is no more entitled to qualified immunity than [the officer using force]." *Edwards v. Shanley*, 666 F.3d 1289, 1298 (11th Cir. 2012).

Here, because no dispute exists that the officers were acting within the scope of their discretionary authority, we proceed to the next steps of the qualified immunity analysis, i.e., whether the officers in question violated the constitutional rights of T.D.H. or Helm and, if so, whether decisions of the Supreme Court, this Court, or the relevant state supreme court—in this case, the Alabama Supreme Court—clearly established that it was a violation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

### B.    The Constitutional Violations

1.    <u>T.D.H.'s excessive force claim against Officer Morris (Count Five)</u>

The Fourth Amendment protects an individual from excessive force during an arrest or detention. *See Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). An arresting officer's use of force is excessive if a reasonable officer would believe it is unnecessary in relation to the situation at hand. *Id.* Indeed, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

11

officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This objective reasonableness test depends on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Because determining reasonableness is an objective test, we do not consider an officer's intent or motivation. *Id.* at 397. This Court also considers the need for application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted by the arresting officer. *Lee*, 284 F.3d at 1198 & n.7. In conducting this analysis, "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). We first address whether T.D.H. and Helm have established a constitutional violation.

T.D.H. contends that Officer Morris violated her Fourth Amendment right to be free from excessive force by tasing her during a medical emergency when there existed no immediate threat of serious bodily injury or death to Officer Morris or any of the other named officers. Officer Morris asserts that tasing T.D.H. three times was a reasonable use of force and, even if it was not, he did not violate T.D.H.'s clearly established constitutional rights. To support this argument, Officer Morris characterizes T.D.H. as "'incapable of making a rational decision', had at best only

12

a tenuous grasp on reality' [sic] and therefore posed a rick [sic] to herself and others, and was, at a minimum, not 'fully secured.'" (citations omitted). Based on this description of the events, Officer Morris relies on *Estate of Hill v. Miracle*, 853 F.3d 306 (6th Cir. 2017), *Callwood v. Jones*, 727 F. App'x 552 (11th Cir. 2018), *Lewis v. City of West Palm Beach*, 561 F.3d 1288 (11th Cir. 2009), and *Buckley v. Haddock*, 292 F. App'x 791 (11th Cir. 2008). He claims that these cases establish that tasing T.D.H. three times was not excessive and that he did not violate her clearly established rights. We find this argument without merit.

In *Estate of Hill*, the Sixth Circuit established a test to determine whether force is objectively reasonable under *Graham* when an officer is responding to a medical emergency, rather than making an arrest. *See* 853 F.3d at 313–14. The Sixth Circuit noted that the traditional excessiveness test does not lend itself to analyzing use of force during a medical emergency and concluded that, in the latter case, courts should ask:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
>
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
>
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

*Id.* at 314. "If the answers to the first two questions are 'yes,' and the answer to the third question is 'no,' then the officer is entitled to qualified immunity." *Id.* The court then applied this test to the facts before it: a diabetic person experiencing a hypoglycemic episode who was fighting off paramedics as they attempted to help him. *See id.* at 314–15. The court found that the officer's single use of a taser was not excessive because the patient was suffering from a life-threatening medical emergency, incapable of making rational decisions as a result, and was actively combative with the paramedics who were trying to provide much-needed medical care. *Id.*

In *Callwood*, this Court, in an unpublished decision, considered two officers' use of their tasers against a naked man covered in scratches who was running through streets and oncoming traffic. *See* 727 F. App'x at 555. The first officer on the scene believed the man to be mentally ill or under the influence and tased him when he continued approaching the officer despite commands to stop. *Id.* Both officers then tased the man after failed attempts to pin him down and as the man continued to violently resist arrest. *Id.* Even as he was handcuffed on the floor, the man continued to struggle and kick, resulting in the officers "hog-tying" him with leg irons and flex cuffs and applying pressure on his back. *Id.* at 555–56. We found that the use of tasers on the man, even as he fell to the ground, was not excessive because the man continued struggling and violently resisting arrest. *Id.* at 559–60. We also noted

14

that "the point at which a suspect falls to the ground . . . is not the dividing point between excessive and non-excessive force.  Instead that point usually turns on whether the suspect is completely restrained or otherwise resisting arrest." *Id.*

Similarly, in *Lewis*, officers also subdued and "hogtied" a man who appeared to be disoriented and agitated and with a tenuous grasp on reality, as the man had resisted arrest and ran into traffic while appearing under the influence of some narcotic.  *See* 561 F.3d at 1290.  The altercation resulted in the man's death.  *Id.*  In finding that the restraints employed on the man did not violate his clearly established rights, we emphasized that "Lewis did not remain compliantly restrained" and "continued to struggle." *Id.* at 1292.

Officer Morris also relies on *Buckley*, an unpublished decision, to establish that a handcuffed person is not necessarily "fully secured," such that the person can still resist and pose a danger.  *See* 292 F. App'x at 795–96 (finding that an officer acted reasonably by deploying his taser on a handcuffed suspect that was resisting arrest and disobeying commands).  However, in *Buckley*, the plaintiff was "a 23–year–old young man who weighed 180 pounds and was 6 feet, 2 inches tall" and displayed erratic, self-destructive, and defiant behavior during a traffic stop.  *Id.* at 792–93.  Moreover, in finding that the officer's use of a taser on the plaintiff was reasonable, we emphasized that the plaintiff was defying the most minimal

15

commands from the officer and was able to move around on a busy road, thereby endangering himself, the officer, and the public. *Id.* at 794–95.

None of the cases Officer Morris relies on are on all fours with this case. Unlike in *Callwood*, *Buckley*, and *Lewis*, it is undisputed here that at least four adult men were holding down T.D.H.—a teenage female—as she continued suffering from grand mal seizures. And resolving disputed factual issues in T.D.H.'s favor, she was not resisting, kicking, spitting, or biting. She was therefore "fully secured" and "completely restrained." Similarly, unlike in *Estate of Hill*, T.D.H. was not combative, posed no threat to others, and, to the extent she posed a risk to herself, that risk could have been managed by simply holding her head to prevent injury from her uncontrollable movements—the technique doctors had taught her family and that her younger sister used before T.D.H. was carried out to the lobby. Officer Morris's use of his taser in drive stun mode, which is meant only to inflict pain, while four men held her down was unnecessary to alleviate T.D.H.'s medical condition or facilitate medical care.

In support of her argument that Officer Morris's use of force was excessive and a violation of the Fourth Amendment, T.D.H. relies on *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009). In *Oliver*, officers encountered a man standing on the grassy median of the road who waved for help. *Id.* at 901. Although the man was behaving erratically, he "never acted in a threating or belligerent manner toward the

16

officers, nor did he even curse at them." *Id.* at 902. One of the officers without warning tased Oliver, causing him to lose control of his body and fall onto to the "scorching hot asphalt." *Id.* at 902–03. Following the first tasering, Oliver "never hit, kicked, punched, or threatened the officers." *Id.* at 903. The officer tased him seven more times, and as a result, Oliver suffered a seizure and died. *Id.* at 903–04. This Court held that the officer violated Oliver's Fourth Amendment rights and concluded that "the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful." *Id.* at 908.

Similar to the plaintiff in *Oliver*, T.D.H. was not suspected of a crime, posed no danger, did not act belligerently or yell at the officers, and did not disobey or resist the officers. *See* 586 F.3d at 906. T.D.H. had the misfortune of suffering a grand mal seizure in a public venue. Officer Morris's use of his taser on T.D.H. three separate times, while T.D.H. was held down by four men while suffering a grand mal seizure, "was grossly disproportionate to any threat posed and unreasonable under the circumstances." *See id.* at 907; *see also Saunders v. Duke*, 766 F.3d 1262, 1268–69 (11th Cir. 2014) (finding the gratuitous use of force on a compliant and restrained suspect is excessive). When viewed in the light most favorable to T.D.H., no reasonable officer in this situation would believe that the use of a taser against T.D.H. was necessary. Moreover, a jury could find that Officer

17

Morris's repeated tasings of T.D.H. amounted to excessive force. *See Lee*, 284 F.3d at 1197 (noting that reasonableness of use of force depends on "whether a reasonable officer would believe that this level of force is necessary in the situation at hand") (internal quotation marks omitted). We therefore conclude that on this summary judgment record T.D.H. has established a violation of the Fourth Amendment.

We now turn to the clearly established prong of the qualified immunity inquiry. Officer Morris is entitled to qualified immunity unless his use of force was not only a violation of the Fourth Amendment, as we have determined, but also a violation of clearly established laws at the time. Officer Morris argues that he was confronted with unique circumstances "in the specific medical-emergency context," and thus there was no "controlling" authority establishing that his actions were unlawful. Based on our precedent, we find this argument unpersuasive.

"*Oliver* clearly established that administering multiple taser shocks can amount to excessive force." *Glasscox*, 903 F.3d at 1218. As discussed above, in *Oliver*, this Court held that an officer's use of his taser on the plaintiff was so "utterly disproportionate . . . that any reasonable officer would have recognized that his actions were unlawful." 586 F.3d at 908. The plaintiff in that case "was not accused of or suspected of any crime, let alone a violent one; he did not act belligerently or aggressively; he complied with most of the officers' directions; and he made no effort to flee." *Id.* Based on the facts viewed in the light most favorable to T.D.H.,

18

*Oliver* is materially indistinguishable from this case. *See Glasscox*, 903 F.3d at 1219. Indeed, this Court has previously held that *Oliver*, along with this Court's decision in *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997), "clearly establish that the repeated tasing of a subdued arrestee who has ceased any resistance or threatening conduct is excessive force in violation of the Fourth Amendment." *See Glasscox*, 903 F.3d at 1219; *see also Lee*, 284 F.3d at 1197 (concluding that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force.").

However, even if no preexisting case fits the facts of this case, Officer Morris's actions fall within the narrow "obvious clarity" exception to establish a violation of clearly established rights. Under the "obvious clarity" exception, this Court looks to the officer's conduct and "inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law." *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)). Officer Morris deployed his taser on a teenage girl three times as she lay immobilized on the floor with at least four to five adult men holding down her arms and legs while she suffered a medical emergency—a grand mal seizure. She was not suspected of committing a crime, and she posed no threat to others. This is one

of those cases that lies at the very core of what the Fourth Amendment prohibits. Tasing an individual once (let alone three times) when the individual poses no threat to the officers or others and is experiencing a medical emergency goes so far beyond the sometimes-blurred border between reasonable and unreasonable force that "qualified immunity will not protect [an officer] even in the absence of case law." *See Fils*, 647 F.3d at 1291–92 (finding that an officer's use of his taser on a non-violent person who was not resisting arrest violated clearly established law based on materially similar case law and under the "obvious clarity" approach); *Vinyard*, 311 F.3d at 1355 (holding that "no factually particularized, preexisting case law was necessary for it to be very obvious to every objectively reasonable officer" that it was unconstitutional to pull a suspect from the back of a police car, after she was secure, in order to pepper spray her for being rude). Indeed, we "have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders*, 766 F.3d at 1265 Here, the use of force by Officer Morris was so patently excessive that the constitutional violation was clearly established "because no reasonable officer could have believed that [Officer Morris's] actions were legal." *Lee*, 284 F.3d at 1199.

Viewing the evidence in the light most favorable to T.D.H., Officer Morris's repeated tasings amounted to excessive force prohibited by the Fourth Amendment.

20

Because the constitutional violation here was clearly established based on both materially similar case law and the obvious clarity exception, we conclude that the district court properly denied qualified immunity to Officer Morris, and we affirm the district court's denial of summary judgment on Count Five.

2.  T.D.H.'s failure to intervene in the use of force claims against Chief Carroll and Officers Kimbrough and Gilliland (Counts Eight, Eleven, and Twelve (in part))

We now consider Chief Carroll and Officers Kimbrough and Gilliland's arguments that they are entitled to summary judgment on the counts alleged by T.D.H. pertaining to their failure to intervene in the use of excessive force by Officer Morris.  First, they argue that they cannot be found liable for failing to intervene because Officer Morris's use of force is entitled to qualified immunity.  As discussed above, because Officer Morris was not entitled to qualified immunity for his use of force against T.D.H., this argument fails.

Second, Chief Carroll and Officers Kimbrough and Gilliland rely on cases from this Court that acknowledge that an officer must be "in a position to intervene" to be held liable for failing to prevent excessive force.  They argue that Officer Morris's tasings of T.D.H. happened quickly under rapidly evolving circumstances and that they did not have an opportunity to intervene.  They further assert that Officers Kimbrough and Gilliland, who held down T.D.H. during all three tasings, could not intervene because they were busy tending to T.D.H.'s medical emergency.

21

As to Chief Carroll, who the district court found was only present during the first tasing, he contends that T.D.H. failed to present evidence that he could do anything but observe the incident.

All of these arguments, however, are based on reading disputed factual issues in a light most favorable to the officers, and, as recognized by the district court, "[t]he timing of events is difficult to discern." While the defendants assert that the tasings occurred in quick succession, the evidence, when viewed in the light most favorable to T.D.H., shows that Chief Carroll and Officers Gilliland and Kimbrough heard and saw Officer Morris threaten to tase T.D.H. and then proceed to carry out that threat and tase T.D.H. three separate times. Moreover, the record shows that, by holding down T.D.H., Chief Carroll and Officers Gilliland and Kimbrough were in close proximity to Officer Morris as he approached with his taser and placed it on T.D.H.'s chest. This suggests that these officers were close enough to at least attempt to intervene and stop Officer Morris. Indeed, there is nothing in the record to suggest that Chief Carroll and Officers Gilliland and Kimbrough were prevented from speaking or yelling at Officer Morris to stop tasing T.D.H. while holding her down.

As to their argument that it was medically necessary to hold down T.D.H., Officers Gilliland and Kimbrough ignore the reasonable inference that it may not have been necessary for four men to hold down T.D.H. by each of her limbs, while

Officer Gilliland held her in a headlock.  One or both officers could have instead tried to prevent Officer Morris—either physically or verbally—from tasing T.D.H.

And as to Chief Carroll, the district court limited T.D.H.'s claim against him to the first tasing because he was not present for the second or third tasing.  With respect to the first tasing, Chief Carroll testified that he participated in holding T.D.H. down for a "couple of minutes."  Thus, a reasonable jury could find that, like Officers Gilliland and Kimbrough, Chief Carroll, who was Officer Morris's superior, had sufficient time and opportunity to intervene and stop the first tasing.

Put simply, the record presents genuine disputed issues of material fact regarding how the events unfolded and whether, during that timeframe, Chief Carroll and Officers Kimbrough and Gilliland were close enough to see Officer Morris's use of excessive force and then attempt to intervene.  Because a reasonable jury could find these Defendants failed to intervene in the use of excessive force by Officer Morris, despite having the opportunity to do so, we affirm the district court's denial of summary judgment on Counts Eight, Eleven and Twelve (in part).  *See Priester*, 208 F.3d at 925.

Finally, Officer Gilliland argues that the district court should have conducted an officer-specific analysis to determine whether his failure to intervene violated clearly established law.  He claims a lack of controlling authority that would have put him on notice that, under the unique circumstances of this case, he should have

23

intervened. However, as this Court expressed in *Priester*, "[t]hat a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994." *Id.* at 927. Moreover, in cases where the use of force is declared clearly unconstitutional, the officers that failed to intervene are "no more entitled to qualified immunity than [the officer using force]." *Edwards*, 666 F.3d at 1298. Once this Court establishes that the use of force is not entitled to qualified immunity and other officers could have intervened but did not, the Court does not conduct a separate clearly established analysis pertaining to each officer's failure to intervene. *See id.* We note, as well, that Officer Morris tased T.D.H. not once or twice, but three times, and there is no indication that Officer Gilliland orally told Officer Morris not to use the taser.

The cases Officer Gilliland relies on do not suggest otherwise. In *Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir. 1999), this Court recognized that "[t]here is no controlling authority clearly establishing that once a police officer knows another officer has fabricated a confession in a police report for a warrantless arrest, that police officer has a constitutional duty to intervene to stop the other officer's conduct." But *Jones* does not deal with the failure to intervene in the use of excessive force and is therefore inapplicable to this case. *See id.* In *Ensley v. Soper*, 142 F.3d 1402, 1407–08 (11th Cir. 1998), this Court held that an officer did not violate clearly established law by not intervening in another officer's use of force,

24

but, as distinguishable to the facts here, it did so based on a conclusion that "no reasonable juror could find that [the officer] was 'in a position to intervene.'" Again, in light of *Priester*, which holds that officers have a clearly established duty to intervene in the use of excessive force when they have "the ability to intervene," *Jones* and *Ensley* are inapplicable to the facts of this case. *See Priester*, 208 F.3d at 927. Because the facts taken in the light most favorable to T.D.H. establish that Chief Carroll and Officers Kimbrough and Gilliland violated a clearly established right by failing to intervene, the district court did not err in concluding that they are not entitled to qualified immunity. Accordingly, we affirm the district court's denial of summary judgment on Counts Eight, Eleven, and Twelve (in part).

3.    T.D.H.'s false imprisonment claim against Officer Morris (Count Twenty-Two)

A false imprisonment claim under § 1983 requires meeting the common law elements of false imprisonment and establishing that the imprisonment was a due process violation under the Fourteenth Amendment. *See Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009). Because Officer Morris does not argue on appeal that T.D.H. failed to meet the common law elements for false imprisonment, we do not address that prong. As to the second prong, in order to establish a due process violation, a plaintiff must show that the officer acted with deliberate indifference, i.e., demonstrating that the officer "had subjective knowledge of a risk of serious harm and disregarded that risk by actions beyond mere negligence." *Id.* If an officer

25

has arguable probable cause to seize an individual, that finding may defeat a claim of deliberate indifference. *See May v. City of Nahunta*, 846 F.3d 1320, 1329 (11th Cir. 2017). Arguable probable cause exists when "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) (emphasis in original) (quoting *Eubanks v. Gerwen*, 40 F.3d 1157, 1160 (11th Cir. 1994)); *accord May*, 846 F.3d at 1328 (explaining that to demonstrate arguable probable cause, "the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed" (quoting *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997))).

Here, Officer Morris asserts entitlement to summary judgment on T.D.H.'s false imprisonment count because (1) "there was no evidence . . . that [Officer] Morris acted with deliberate indifference in restraining or confining T.D.H.," as T.D.H. "reasonably appeared to [Officer] Morris to be 'disorderly,' 'out of control,' and posing a risk to herself, the involved officers, or both," and (2) "there was arguable probable cause to detain or arrest T.D.H." for disorderly conduct. Both these arguments suffer from the same infirmity—they rely on disputed factual issues and inferences drawn in Officer Morris's favor. The facts, viewed in the light most favorable to T.D.H., do not support a finding that Officer Morris had arguable

26

probable cause "to either detain T.D.H. or arrest her for disorderly conduct." Viewed in that light, T.D.H. was experiencing a medical emergency while she was being held down, and Officer Morris knew that she was experiencing a medical emergency. While Officer Morris claims that T.D.H. was "out of control," he does not explain how a reasonable officer who is told that someone is suffering from medical seizures—and then, in fact, witnesses those seizures—could have arguable probable cause to believe that person is being disorderly.

Similarly, Officer Morris's argument that it was necessary for him to detain T.D.H. for medical attention is without merit. In support of this argument, Officer Morris relies on *May*, but *May* does not absolve Officer Morris of liability here. In *May*, we considered qualified immunity for an officer that confined and transported the plaintiff to a hospital for psychological evaluation. *See* 846 F.3d at 1325–26. There, the plaintiff's family was concerned that the plaintiff would not get out of bed, and the family called 911. *Id.* at 1325. In response to the 911 call, four emergency medical technicians ("EMTs") arrived at the house and woke up the plaintiff, who declined to go to the hospital and became upset and "combative to herself." *Id.* In the interim, an officer received a call from 911 requesting assistance. *Id.* Upon his arrival, one of the EMTs advised the officer that the plaintiff had been hitting herself on the head. *Id.* After observing the plaintiff himself and hearing the statements about the plaintiff's behavior from the EMTs, the officer decided to

27

detain the plaintiff and transport her to the hospital in his police car for a psychological evaluation, and the plaintiff's family did not object. *Id.* at 1325–26. On appeal, we found that the officer had arguable probable cause to detain the plaintiff for medical reasons and thus, as to the false imprisonment claim, the plaintiff could not show that the officer acted with deliberate indifference to her right to be free from unlawful detention. *Id.* at 1329.

Here, construing the facts in T.D.H.'s favor, even after Officer Morris was informed that T.D.H. was suffering from a medical emergency and witnessed that fact himself, he tased her three times. The repeated tasings occurred even though paramedics were on their way to the concert venue to tend to T.D.H. All that was required for T.D.H.'s well-being in the interim was for someone to hold her head and to make sure she did not harm herself during the seizures. In other words, unlike in *May*, Officer Morris lacked arguable probable cause to detain T.D.H. for disorderly conduct, as T.D.H.'s medical condition and the circumstances surrounding the detention did not justify the alleged imprisonment. Moreover, in *May*, we found that, while the officer was entitled to qualified immunity for his *decision* to initially detain the plaintiff, he was not entitled to qualified immunity for the *manner* in which he detained the plaintiff. *See id.* at 1331–33 (finding that factual questions remained as to whether the officer's conduct violated the female plaintiff's constitutional right to personal security where the officer detained the plaintiff in a

28

locked room for twenty minutes and forced the plaintiff to disrobe after she asked the officer to leave and without the presence of the female EMT). As discussed above pertaining to Officer Morris's use of force, the manner in which Officer Morris seized T.D.H., i.e., by tasing her three times—let alone once—is unreasonable. As such, *May* does not establish that Officer Morris is entitled to qualified immunity for the false imprisonment count. We therefore affirm the district court's denial of summary judgment on T.D.H.'s false imprisonment claim (Count Twenty-Two) against Officer Morris.

4.    Helm's failure to intervene claims against Officer Fazekas (Counts One and Two)

Helm's failure to intervene claims against Officer Fazekas both relate to nonparty Officer Morgan's use of his taser on Helm while she lay handcuffed facing the ground. Officer Fazekas argues that he is entitled to summary judgment because Officer Morgan's use of force was not clearly unconstitutional.[5] Specifically, Officer Fazekas argues that "Helm was, in circumstances that were already extremely chaotic, invading an area that [Officer] Fazekas was trying to secure and protect from a gathering, raucous crowd . . . [and] [Officer] Morgan had the right to

---

[5] Officer Fazekas also argues that evidence does not support a finding that he was able to intervene because there is nothing showing that he was even present at the scene or observed Officer Morgan tasing Helm. The district court expressly disregarded this issue because Officer Fazekas did not make this argument in his motion and, at most, "cursorily addresse[d]" it in his reply brief. We agree and decline to consider this argument made for the first time on appeal. *See Finnegan v. Comm'r of Internal Revenue*, 926 F.3d 1261, 1271 (11th Cir. 2019).

arrest Helm" for disorderly conduct and obstructing the officers' governmental operations. Officer Fazekas's characterization of the events, however, runs contrary to the facts when those facts are viewed in the light most favorable to Helm. In that light, Helm was: (1) tackled before entering the lobby of the venue; (2) did not have the opportunity to explain why she was there or what was happening to T.D.H.; (3) was restrained and handcuffed with her face to the floor; and (4) after being restrained, was gratuitously tased in the back. Furthermore, Helm had not been accused of a crime and did not pose a threat prior to being tackled or detained.

Moreover, even if Officer Morgan had probable cause to arrest Helm, her claims against Officer Fazekas are based on his failure to intervene in the subsequent tasing, not the initial detainment. Officer Fazekas fails to address the undisputed evidence that Helm was handcuffed and restrained on the floor when Officer Morgan deployed his taser. Officer Fazekas argues that "[Officer] Morgan used an amount of force that was necessary to effect the arrest." However, viewing the facts in the light most favorable to Helm, her claim falls squarely within the clearly established principles discussed above—that "a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders*, 766 F.3d at 1265. Because a jury could reasonably infer that Officer Fazekas was in a position to intervene against Officer Morgan's unlawful use of

excessive force against Helm and failed to do so, the district court did not err in concluding that at this stage Officer Fazekas was not entitled to qualified immunity on Helm's failure to intervene claims. We therefore affirm the district court's denial of summary judgment on Counts One and Two.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of summary judgment as to Chief Carroll as to Count Twelve (in part) and affirm the district court's denial of summary judgment as to Officers Morris, Kimbrough, Gilliland and Fazekas as to Counts One, Two, Five, Eight, Eleven, and Twenty-Two.

**AFFIRMED**.

31